## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RACHEL M. CHANEY, DOUG C. DAVIS, JULIE M. DAVIS, GARY W. DOSS, AND REBECCA R. DOSS, | |
| Plaintiffs, | C.A. No.: 1:24-cv-2975 |
| v. | COMPLAINT AND DEMAND FOR JURY TRIAL |
| PERDUE FARMS INC., FPP BUSINESS SERVICES INC. d/b/a PERDUE FARMS INC., PERDUE AGRIBUSINESS LLC, PERDUE AGRIBUSINESS INCORPORATED d/b/a PERDUE AGRIBUSINESS LLC, PERDUE AGRIBUSINESS GRAIN LLC d/b/a PERDUE AGRIBUSINESS LLC, PERDUE FOODS LLC, and PERDUE FOODS INCORPORATED d/b/a PERDUE FOODS LLC, XXX | |
| Defendants. | |

## <u>COMPLAINT</u>

**NOW COME** the Plaintiffs, Rachel M. Chaney, Doug C. Davis, Julie M. Davis, Gary W. Doss, and Rebecca R. Doss, (collectively "Plaintiffs"), by and through the undersigned counsel, and complaining of the Defendants, Perdue Farms Inc., FPP Business Services Inc. d/b/a Perdue Farms Inc, Perdue Agribusiness LLC, Perdue Agribusiness Incorporated d/b/a Perdue Agribusiness LLC, Perdue Agribusiness Grain LLC d/b/a Perdue Agribusiness LLC, Perdue Foods LLC, and Perdue Foods Incorporated d/b/a Perdue Foods LLC, (collectively "Perdue" or "Defendants"), hereby allege and state as follows:

## THE PARTIES

1.      Plaintiff Rachel M. Chaney is an adult individual who resides at 506 Barnsdale Drive, Salisbury, Maryland 21804 in Wicomico County.

2.      Plaintiff Doug C. Davis is an adult individual who resides at 504 Barnsdale Drive, Salisbury, Maryland 21804 in Wicomico County.

3.      Plaintiff Julie M. Davis is an adult individual who resides at 504 Barnsdale Drive, Salisbury, Maryland 21804 in Wicomico County.

4.      Plaintiff Gary W. Doss is an adult individual who resides at 812 Friar Tuck Lane, Salisbury, Maryland 21804 in Wicomico County.

5.      Plaintiff Rebecca R. Doss is an adult individual who resides at 812 Friar Tuck Lane, Salisbury, Maryland 21804 in Wicomico County.

### a.   Perdue Farms Defendants

6.      Perdue Farms Inc., is a Maryland corporation that identifies its principal place of business as 31149 Old Ocean City Road, Salisbury, Maryland. Defendant Perdue Farms Inc. is authorized to conduct business within the State of Maryland. Defendant Perdue Farms Inc.'s registered agent for service in the state of Maryland is The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21804.

7.      FPP Business Services Inc. d/b/a Perdue Farms Inc. is a Maryland corporation that identifies its principal place of business as 31149 Old Ocean City Road, Salisbury, Maryland 21804. Its registered agent is The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093. Defendant FPP Business Services merged into Perdue Farms Inc. effective December 31, 2012.

8.      Collectively Perdue Farms Inc. and FPP Business Services Inc. d/b/a Perdue Farms Inc. are referred to as "Perdue Farms" in this complaint.

### b.   Perdue Agribusiness Defendants

9.      Perdue Agribusiness LLC is a wholly-owned division of Perdue Farms engaged in the processing, sale and transport of grains, oil, and feed ingredients. Perdue Agribusiness LLC is a limited liability company registered to do business in the State of Maryland. Perdue Agribusiness LLC's principal place of business is 31149 Old Ocean City Road, Salisbury, Maryland 21804 and has a registered agent of The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

10.     Perdue Agribusiness Incorporated d/b/a Perdue Agribusiness LLC is a wholly-owned division of Perdue Farms Inc. Perdue Agribusiness Incorporated is a Maryland corporation authorized to do business in the State of Maryland with a principal place of business located at 31149 Old Ocean City Road, Salisbury, Maryland 21804. Its registered agent is The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093. Perdue Agribusiness Incorporated merged into Perdue Agribusiness LLC in September 2012.

11.     Perdue Agribusiness Grain LLC d/b/a Perdue Agribusiness LLC is a wholly owned division of Perdue Farms Inc. Perdue Agribusiness Grain is a Maryland limited liability company registered to do business in the State of Maryland with a principal place of business located at 31149 Old Ocean City Road, Salisbury, Maryland 21804. Its registered agent is: The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093. Perdue Agribusiness Grain LLC merged into Perdue Agribusiness LLC in October 2022.

12.     Collectively, Perdue Agribusiness LLC, Perdue Agribusiness Incorporated d/b/a Perdue Agribusiness LLC, and Perdue Agribusiness Grain LLC d/b/a Perdue Agribusiness LLC are referred to as "Perdue Agribusiness" in this complaint.

### c. Perdue Foods Defendants

13.     Perdue Foods LLC is a wholly owned division of Perdue Farms Inc. Perdue Foods LLC is a Maryland limited liability company registered to do business in the State of Maryland with a principal place of business located at 31149 Old Ocean City Road, Salisbury, Maryland 21804. Its registered agent is The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

14.     Perdue Foods Incorporated d/b/a Perdue Foods LLC is a wholly owned division of Perdue Farms Inc. Perdue Foods Incorporated is a Maryland corporation registered to do business in the State of Maryland with a principal place of business located at P.O. Box 1537, Salisbury, Maryland 21801. Its registered agent is Pelham B. Lawrence located at P.O. Box 1537, Old Ocean City Road, Salisbury, Maryland 21801. Perdue Foods Incorporated merged into Perdue Foods LLC in 1987.

15.     Collectively Perdue Foods LLC and Perdue Foods Incorporated d/b/a Perdue Foods LLC are referred to as "Perdue Foods" in this complaint.

16.     Collectively Perdue Farms, Perdue Agribusiness, and Perdue Foods are referred to as "Defendants" or "Perdue" in this complaint.

17.     Perdue Agribusiness and Perdue Foods, both subsidiaries of Perdue Farms, are the owners and operators of an industrial property, comprised of over 250 acres of real property located in 6906 Zion Church Road, Salisbury, Maryland 21804 (the "Salisbury Agribusiness Facility" or "Agribusiness Facility").

18.     Perdue Farms is a privately-held company and a major chicken, turkey, and pork processing and poultry farming company, which has reported annual sales of more than $10 billion.

19.     Perdue Agribusiness ranks among the largest United States grain operations.

20.     Perdue states in its 2024 Company Stewardship Report that "we know we must go beyond compliance to actively address the full range of environmental stewardship challenges related to animal agriculture and food production."

21.     At all times relevant to the facts and allegations set forth herein, the Perdue Defendants: (a) maintained licenses and registrations to do business in the State of Maryland; (b) regularly conducted business in the State of Maryland; (c) maintained continuous and systematic contacts with the State of Maryland; (d) committed acts and/or omissions within the State of Maryland which gave rise to the instant action; (e) injected their products and/or materials into the stream of commerce within the State of Maryland; and/or (f) acted as one entity with a parent or subsidiary which, at all times relevant to the facts and allegations set forth herein, had continuous and systematic contacts with the State of Maryland.

## JURISDICTION AND VENUE

22.     The state law claims asserted in this Complaint are brought pursuant to Maryland common law.

23.     On information and belief, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

24.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Defendants, as Defendants caused and continue to cause tortious injury in the State of Maryland, performed and continue to perform acts or omissions within the State of Maryland which caused and continue to cause such tortious injury, regularly conduct and/or solicit business within the State of Maryland, engage in other persistent courses of conduct in the State of Maryland, and/or derive substantial revenue from goods, services, and/or manufactured products used and consumed within the State of Maryland.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendants are considered residents of the State of Maryland, under 28 U.S.C. § 1391(c)(2), and thus are entities over which this Court has personal jurisdiction. Venue is further proper under 28 U.S.C. § 1391 (b)(2), because the acts and/or omissions of Defendants giving rise to Plaintiffs' claims occurred in Maryland, and the property which is the subject of the action is situated in Maryland.

## JURY DEMAND

27.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

## GENERAL FACTUAL ALLEGATIONS

### Background Regarding PFAS

28.     Per- and polyfluoroalkyl substances ("PFAS") are a large group of over four thousand (4,000) chemical compounds, including but not limited to perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA") and Perfluorohexane Sulfonic Acid (PFHxS).

29.     Due to their chemical structure, PFAS are biologically and chemically stable in the environment and resistant to environmental degradation processes, and thus remain present in the environment long after they are initially released.

30.     PFAS bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, and remain in the human body.

**Toxicity of PFAS**

31.     PFOA and PFOS are highly carcinogenic and otherwise toxic and/or harmful to human beings (and other living creatures) who inhale, ingest, or otherwise absorb PFOA, PFOS, and other PFAS chemicals.

32.     Specifically, PFOA and PFOS are readily absorbed after ingestion or inhalation exposure, binds to albumen in an individual's blood serum, and are concentrated in the liver and kidneys.

33.     When released into the environment, PFOA and PFOS are particularly persistent in water and soil and, because of their solubility in water, can readily migrate from soil to groundwater.

34.     Moreover, due to their resistance to biodegradation, hydrolysis and photolysis and high resistance to virtually all methods of traditional purification and/or eradication, PFOA and PFOS remains in the environment—and in the human body—long after their initial discharge and/or consumption/absorption.

35.     PFOA and PFOS are especially concerning from a human health standpoint precisely because the chemicals can stay in the environment and in the human body for long periods of time.

36.     Myriad health risks associated with exposure to PFOA exist, and such risks are present even when PFOA is ingested at very low levels.

37.     Specifically, PFOA is associated with, *inter alia*, increased risk in humans of testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, along with thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-2 diabetes in women, pre-eclampsia, developmental delays in children, and other health conditions.

38.     PFOS is associated with increased risk for certain cancers, including liver and kidney cancer, changes in liver function, preeclampsia, increased risks of low birth weights, decreased antibodies in children, hypothyroidism and increase thyroid disease, immunosuppression, infertility and increased cholesterol.

39.     PFHxS is associated with liver function disruptions, thyroid and hormone level changes, developmental effects, decreased antibody response and memory impairment.

40.     Upon information and belief, PFOA, PFOS and PFHxS have the ability to cause other cancers and illnesses not yet associated with human exposure.

### History of PFAS Regulation

41.     In 2009, the U.S. Environmental Protection Agency ("EPA") identified PFOA and PFOS, among other PFAS, as an emerging contaminant of concern and issued provisional health advisories (HAs") under the Safe Drinking Water Act stating that exposure to concentrations of PFOA at 400 parts per trillion ("ppt") or more or PFOS of 200 ppt or more in drinking water can cause adverse human health effects.

42.     The EPA updated its health advisories for PFOA and PFOS, including setting a lifetime health advisory of 70 ppt for both substances in 2016.

43.     The body of science establishing the danger of PFAS continued to expand and, in April 2021, EPA created an EPA Council on PFAS to establish a strategy for accelerated regulation of PFAS, among other things.

44.     In May 2021, the Agency for Toxic Substances and Disease Registry finalized toxicological profiles for PFOA and PFOS (among other PFAS) that established minimal risk levels based on the danger presented by PFAS. From these, EPA established a human Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by the EPA as an "estimate (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime."

45.     On June 15, 2022, in accordance with the danger presented by these substances, EPA set interim lifetime health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS that took into account drinking water, air, food, and products. These limits were established to provide guidance and "to protect all people, including sensitive populations and life stages, from adverse health effects resulting from exposure throughout their lives to a compound."

46.     In March 24, 2023, the EPA established preliminary guidance determinations for PFHxS, PFNA, HFPO-DA, and PFBS in accordance with the Safe Drinking Water Act regulatory development process for a regulatory limit of 10 ppt for PFHxS either individually, or in combination through a mixture with any of the following compounds: PFNA, HFPO-DA and/or PFBS. The EPA proposed to regulate PFOA and PFOS with individual MCLs and PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index which accounts for co-occurring mixtures of these four PFAS."

47.     In February 2024, the EPA proposed to list 9 PFAS (including PFOA and PFOS) as "hazardous constituents," under the Resource Conservation and Recovery Act ("RCRA").  The effect of including these substances in the RCRA hazardous constituent list appearing at 40 CFR Section 261, Apdx VIII is to bring PFAS contaminated sites within RCRA's corrective action authority, available to the EPA and to citizens.

48.     In April 2024, the EPA established a National Primary Drinking Water Standard for PFAS, including PFOA and PFOS. Unlike the prior Health Advisories, Safe Drinking Water standards must also take into consideration cost of implementation and practical enforceability. EPA set the standards for PFOA and PFOS at 4 ppt. Certain other PFAS were set at 10 ppt. These standards became the operative Maximum Contaminant Levels ("MCLs") for drinking water. The EPA also set a non-enforceable health-based goal of zero for both PFOA and PFOS.

49.     Additionally, the EPA established a regulatory limit of 10 ppt for PFHxS either individually, or in combination through a mixture with any of the following compounds: PFNA, HFPO-DA and/or PFBS. The EPA stated that decades of research showed that some chemicals, such as PFHxS, can combine in mixtures and have additive health effects, even if the individual chemicals were present at lower levels.

50.     The EPA said in April 2024 that the new standards would prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses.

51.     In April 2024, the EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). This has the effect of making sites contaminated with these substances subject to clean up under the Superfund law.  It also requires that releases of these harmful chemicals be reported.

52.     In September 2024, the EPA established PFOS and PFOA freshwater ambient water quality criteria and saltwater benchmarks for fish, which have also been contaminated by PFAS discharges.  The EPA also established ambient water quality benchmarks for the broader array of PFAS substances that are harmful to fish.

53.     Maryland, having detected PFAS in fish tissue from the Chesapeake Bay, has also set a fish consumption advisory.

54.     The website for Maryland's Department of the Environment ("MDE") describes PFAS, including PFOA, as chemicals that "are persistent in the environment and the human body, meaning they do not break down easily and accumulate over time."

55.     MDE has published on its website that, "According to the Agency for Toxic and Disease Registry (ATSDR) some, but not all, studies in humans with PFAS exposure have shown that certain PFAS may: affect growth, learning and behavior of infants and older children, lower a woman's chance of getting pregnant, interfere with the body's nature hormones, increase cholesterol levels, affect the immune system, [and] increase the risk of cancer."

### Excessive Levels of PFAS in the Groundwater at Defendants' Facility

56.     Defendants Perdue Farms, Perdue Agribusiness, and Perdue Foods own and operate approximately 250 acres of real property at 6906 Zion Church Road, northeast of Salisbury, Maryland, on which they have constructed and operate a large industrial complex for grain storage, a feed mill, soybean extraction plant, an oilseeds refinery, hatcheries, and marigold greenhouses. This facility is comprised of a series of contiguous parcels of land, occupying the land which extends approximately to Route 50 to the west, Morris Leonard Rd to the north, Zion Church Road to the east, and extending slightly beyond rail tracks utilized by the Defendants to the south.

Property records identify Perdue Foods LLC, and Perdue Agribusiness LLC, both wholly owned subsidiaries of Perdue Farms, as the owners of this real property.



*Figure 1: Sourced from Google Earth*

57.     On information and belief, each Defendant has participated in the operation of the facility at 6906 Zion Church Road and in the conduct alleged herein, during the relevant period for which each entity existed. On information and belief, since 1968, this facility has been operated by Perdue Farms or one of its subsidiaries: Perdue Foods and Perdue Agribusiness LLC.

58.     On information and belief, approximately 175,000 gallons of wastewater are generated at the Agribusiness Facility each day where it is treated and either discharged to the adjacent Peggy's Branch, spray irrigated on-site on approximately 40 acres of crop land or approximately 25 acres of forest, or stored for subsequent discharge or spray irrigation.

59.     On information and belief, wastewaters generated by operations at the Agribusiness Facility that are spray irrigated on the onsite cropland and forest include hatchery process wastewater, refinery wastewater, soybean extraction wastewater, vehicle wastewater, sanitary wastewater and non-contact boiler blowdown and cooling water.

60.     On information and belief, MDE discovered in September 2023 that Defendants' wastewater that is disposed on cropland and forested areas by spray irrigation at the Agribusiness

Facility contained highly elevated levels of PFAS compounds, including 694 ppt of PFOS and 40 ppt of PFOA. On information and belief, a portion of this same wastewater also is directly discharged to Peggy's Branch.

61.     On information and belief, subsequent testing of the groundwater at the Agribusiness Facility in January 2024 revealed highly elevated levels of PFAS compounds, including 1370 ppt of PFOS and 1300 ppt of PFHxS. The safe drinking water levels for these PFAS compounds as proposed by EPA in June 2022 and finalized by EPA in April 2024 are 4 ppt and 10 ppt, respectively.

62.     On information and belief, the Agribusiness Facility overlies a shallow unconfined aquifer, known as the Salisbury Aquifer, that is susceptible to contamination from surface sources such as wastewater and other wastes disposed at or from the Agribusiness Facility.

63.     On information and belief, groundwater in the Salisbury Aquifer in the vicinity of the Agribusiness Facility is moving to the west and southwest, across U.S. Rt 50, at a rate of approximately 400 to 600 feet per year towards homes with shallow private wells, some of which are less than 1000 feet from the Facility's wastewater spray irrigation field.

64.     On information and belief, there are more than 500 homes with private shallow wells used for potable water located within two miles or more in the downgradient flow direction of the Facility's wastewater disposal spray field and Peggy's Branch. The groundwater flow direction of the Salisbury Aquifer, based on available literature, and the residential areas with private wells downgradient from the Agribusiness Facility are depicted in the figure below.



see: Andreasen, D.C. and Smith, B.S., 1997. Hydrogeology and simulation of ground-water flow in the upper Wicomico River Basin and estimation of contributing areas of the City of Salisbury well fields, Wicomico County, Maryland, Maryland Geological Survey, Report of Investigations #65

65.     On information and belief, the PFOS level in groundwater at Defendants' Facility that is migrating towards Plaintiffs' and class members' wells exceed the EPA's safe drinking water standard by 340 times.  Similarly, the PFHxS level in that same groundwater that is migrating towards Plaintiffs' and class members' wells exceed EPA's safe drinking water standard by 130 times.

66.     On information and belief, the safe levels for multiple PFAS compounds, including PFOS and PFHxS, have been, are presently or will in the future be exceeded in Plaintiffs' and class members' wells used for potable water, as a result of the Defendants' wrongful conduct.

67.     On information and belief, on or about October 1, 2024, almost a year after MDE reportedly discovered the elevated levels of PFAS in its wastewater that had been sprayed on its wastewater disposal field for at least 20 years, Defendants sent letters to residents in the

14

communities west of U.S. Rt 50 advising them that Defendants would test their well water and offer to supply bottled water for drinking purposes. *See* Exhibit A.

68.     During years when Defendants were spray irrigating or otherwise discharging its wastewater to surrounding fields, it failed to perform adequate testing of the wastewater, so as to ensure it did not have excessive levels of hazardous substances. Defendants understood that the water had the ability to migrate into groundwater and reach community drinking water supplies, including private wells. During this time Plaintiffs and class members continued to drink contaminated water.

69.     Defendants did begin to perform testing and understood as of September of 2023 that its wastewater, which it had been using for spray irrigation and otherwise discharging to the environment, was highly contaminated with excessive levels of PFAS chemicals. Despite this knowledge, Defendants took no action to correct its contamination or notify residents that their drinking water had potential to be, and likely was, contaminated with toxic chemicals. During this time Plaintiffs continued to drink contaminated water.

70.     As of April of 2024, Defendants knew, and understood that their negligence had resulted in the PFAS in their wastewater entering residential groundwater at high levels, that was migrating downgradient to be used by homeowners' private wells. Despite this knowledge, Defendants took no action to correct its contamination or notify residents that their drinking water had the potential to be, and likely was, contaminated with toxic chemicals. During this time Plaintiffs continued to drink contaminated water.

71.     Defendants took no action until September 30, 2023, when they first notified a resident that their drinking water had been contaminated.

## FACTS RELATED TO PLAINTIFFS

72.     Ms. Cheney owns and resides at her home located at 506 Barnsdale Drive, Salisbury, Maryland 21804 in Wicomico County. She is also the owner of the residence at 508 Barnsdale Drive, Salisbury, Maryland 21804. She has resided at 506 Barnsdale Drive since 2022. From 2013-2022, Ms. Cheney lived at 508 Barnsdale Drive.

73.     Ms. Cheney lives approximately 1.0 miles away from the Agribusiness Facility.

74.     Ms. Cheney's residence utilizes a well system for use and delivery of its potable water from the time that she moved into her residence.

75.     Ms. Cheney drinks, bathes in, cooks with, irrigated her properties with, washed her hands with, brushed her teeth with, provide(d) her animals with, and otherwise used water from her well, drawn from the groundwater contaminated by Perdue.

76.     Ms. Cheney has suffered, and continues to suffer, from a variety of health effects that are known to be caused by exposure to PFAS and other constituents discharged from Defendants' operations.

77.     Ms. Cheney's consumption of contaminated water has exposed her to increased risk of developing adverse health conditions, including cancer, which will require medical monitoring in the future.

78.     Ms. Cheney's health conditions were proximately caused by consumption and use of contaminated water and drinking water, drawn from the groundwater contaminated by Perdue.

79.     Mr. and Mrs. Davis have resided at 504 Barnsdale Drive, Salisbury, Maryland 21804 since 2014. Before that, Mr. and Mrs. Davis resided at 506 Barnsdale Drive, Salisbury, Maryland 21804, a property owned by Ms. Cheney, from 2011 to 2014.

80.     Mr. and Mrs. Davis reside approximately 0.75 miles from the Agribusiness Facility.

81.     Mr. and Mrs. Davis's residence utilizes a well system for use and delivery of its potable water for the entirety of their time residing at either 504 Barnsdale Drive or 506 Barnsdale Drive.

82.     Mr. and Mrs. Davis drink, bathe in, cook with, irrigated their properties with, washed their hands with, brushed their teeth with, provide(d) their animals with, and otherwise used water from the well, drawn from the groundwater contaminated by Perdue.

83.     Mr. Davis has suffered, and continues to suffer, from a variety of health effects that are known to be caused by exposure to PFAS and other constituents discharged from Defendants' operations.

84.     Mr. Davis's consumption of contaminated water has exposed him to increased risk of developing adverse health conditions, including cancer, which will require medical monitoring in the future.

85.     Mr. Davis's health conditions were proximately caused by consumption and use of contaminated water and drinking water, drawn from the groundwater contaminated by Perdue.

86.     Mrs. Davis has suffered, and continues to suffer, from a variety of health effects that are known to be caused by exposure to PFAS and other constituents discharged from Defendants' operations.

87.     Mrs. Davis's consumption of contaminated water has exposed her to increased risk of developing adverse health conditions, including cancer, which will require medical monitoring in the future.

88.     Mrs. Davis's health conditions were proximately caused by consumption and use of contaminated water and drinking water, drawn from the groundwater contaminated by Perdue.

89.     Mr. and Mrs. Doss own and reside at their home located at 812 Friar Tuck Lane, Salisbury, Maryland 21804. They have resided at their current residence for approximately 35 years. Mr. and Mrs. Doss's daughter resided at the residence from birth until the age of 21.

90.     Mr. and Mrs. Doss reside approximately 1.36 miles from the Agribusiness Facility.

91.     Mr. and Mrs. Doss's residence currently utilizes a well system for use and delivery of its potable water and has done so from the time they moved into their residence.

92.     Mr. and Mrs. Doss's residence is adjacent to Middle Neck Branch, a tributary to Peggy Branch.

93.     Mr. and Mrs. Doss, and their family, have used and continued to utilize the stream for recreational purposes.

94.     Mr. and Mrs. Doss drink, bathe in, cook with, irrigated their properties with, washed their hands with, brushed their teeth with, provide(d) their animals with, and otherwise used water from the well, drawn from the groundwater contaminated by Perdue.

95.     Mr. Doss' consumption of contaminated water has exposed him to increased risk of developing adverse health conditions, including cancer, which will require medical monitoring in the future.

96.     Mr. Doss's health conditions were proximately caused by consumption and use of contaminated water and drinking water, drawn from the groundwater contaminated by Perdue.

97.     Mrs. Doss' consumption of contaminated water has exposed her to increased risk of developing adverse health conditions, including cancer, which will require medical monitoring in the future.

98.     Mr. Doss's health conditions were proximately caused by consumption and use of contaminated water and drinking water, drawn from the groundwater contaminated by Perdue.

## CLASS ALLEGATIONS

99.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

100.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

101.     Plaintiffs bring this class action on behalf of the following classes, as set forth below:

      a.  All individuals who are owners of real property located in the Contamination Zone, or who were owners of real property located in the Contamination Zone as of October 1, 2024.

      b.  All individuals who (a) lived, resided, worked or attended school or church in the Contamination Zone  for a period of at least six months, between January 1, 1985 and the date of certification in this case; (b) during that time, ingested PFAS-contaminated water at their residence, work, school or church from a PFAS-contaminated private or contaminated community well within the Contamination Zone; and (c) have not been diagnosed with testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-2 diabetes, pre-eclampsia, or developmental delays, as of the date this Class is certified.

c.  All individuals who (a) lived, resided, worked or attended school or church in the Contamination Zone for a period of at least six months, between January 1, 1985, and the date of certification in this case; (b) during that time, ingested PFAS-contaminated water at their residence, school or church from a PFAS-contaminated private well or contaminated community well within the Contamination Zone; and (c) have been diagnosed with testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-2 diabetes, pre-eclampsia, or developmental delays, as of the date this Class is certified.

102.    As referred to in the class definitions above, the "Contamination Zone" shall mean "all properties within the State of Maryland that are located in the area west and southwest of the Perdue Agribusiness Facility, covering residential and commercial properties encompassed by a polygon approximately 3.25 square miles in area, starting due west of the Perdue Agribusiness Park on the west side of the Route 50 bypass; then following Route 50 south, turning westward along Business Route 50, turning south on Beaglin Park Drive, and then west on Mt. Hermon Rd (Rte 350), southwest on Civic Avenue, west on Glen Avenue, south on Hillside drive, then following North Park Drive westward until turning eastward on East Main Street; turning, northwest on Davis Street, until turning northeastward on E. Church Street, following East Church Street, until turning north on Moss Hill Lane, making a right on Deborah Drive, following it east and north, beyond Middleneck Drive, to the north shore of Peggy Branch,  following the north shore of Peggy Branch eastward to Beaglin Park Drive, following Beaglin Park Drive north to Zion Road, then following Zion Road eastward until it intersects the south side of the Route 50

20

Bypass, thereby following the bypass to its starting point due west of the Perdue Agribusiness Facility.   The area depicting the "Contamination Zone" is shown in the figure below.



103.    Excluded from the definition of the Classes as set forth above are: (a) Defendants, any entity or division in which any Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors.

104.    Plaintiffs reserve the right to revise the Class definition, including temporal aspects of the Class definition, and the Contamination Zone, based on facts developed through the continued litigation of this action, including expert investigation and discovery from, among other sources, Defendants, MDE, and the EPA, as well as groundwater monitoring and modeling data. In particular, the class definition may amended, expanded or contracted in certain regions based

upon expert evaluation of information obtained through discovery and other relevant considerations.

105.     Upon information and belief, the number of members of each Class exceeds 1,000 or more, and therefore, the Classes are so numerous that joinder of all members is impracticable.

106.     The questions of law and fact in this case are uniquely common as to all members of one or more of the Classes.

107.     There are common questions of law and fact in this action which are not only common as to the Classes, but which predominate over any question affecting only individuals.  The predominating questions include, but are not limited to:

     a.  Determination of the role and responsibilities of the Perdue Defendants in the contamination from the Perdue Agribusiness Facility;

     b.  Determination and/or modeling of the migration of PFAS and other contaminants from the Perdue Agribusiness Facility into the surrounding environment;

     c.  Determination and/or modeling of the travel of PFAS and other contaminants from the Perdue Agribusiness Facility into surrounding groundwater and surface water bodies;

     d.  Whether and over what periods of time the Perdue Defendants negligently and/or improperly emitted PFAS from the facilities it operated at the Agribusiness Facility;

     e.  Whether and over what periods of time the Perdue Defendants negligently and/or improperly discharged PFAS to the groundwater beneath the facilities it operated at the Agribusiness Facility;

f.  Whether and over what periods of time the Perdue Defendants mishandled and disposed of PFAS waste inappropriately;

g.  Whether the Perdue Defendants utilized appropriate pollution controls at the facilities it operated at the Agribusiness Facility;

h.  Whether and what periods of time the Perdue Defendants knew or should have known that it was unreasonably dangerous to dispose of PFAS into the environment;

i.  Whether injunctive relief may be necessary to prevent current and future water pollution caused by the Perdue Defendants, including necessary upgrades to the Perdue Agribusiness Facility;

j.  Whether injunctive relief may be necessary to prevent future contamination from the Perdue Agribusiness Facility;

k.  Whether injunctive relief may be necessary to prevent the use or generation of PFAS at the Perdue Agribusiness Facility;

l.  Whether and what type of corrective action is necessary to remedy the environment and property damage caused by Perdue's conduct in contaminating the land, groundwater and surface waters;

m.  Whether and what periods of time the Perdue Defendants breached a legal duty to Plaintiffs and the Classes by disposing of PFAS in the manner described herein;

n.  Whether and what periods of time the Perdue Defendants breach of a legal duty caused class members' potable water to become contaminated with PFAS;

o.  Whether and what periods of time it was foreseeable that the Perdue Defendants' use and/or disposal of PFAS would cause class members' potable water to become

contaminated and/or unreasonably dangerous for normal and foreseeable human consumption or use;

p. Whether and what periods of time the Perdue Defendants were negligent, grossly negligent, reckless, and/or acted in a willful or wanton manner with respect to their manufacturing operations and pollution controls used at the facilities it operated at the Agribusiness Facility;

q. Whether and what periods of time the Perdue Defendants were negligent, grossly negligent, reckless and/or acted in a willful or wanton manner with respect to its handling, treatment and disposal of wastewater generated at the Agribusiness Facility;

r. Whether and what periods of time the PFAS contamination described herein substantially interfered with Plaintiffs' and class members' use and enjoyment of their properties;

s. Whether and what periods of time the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of Plaintiffs and the Classes;

t. Whether and what periods of time Perdue caused the devaluation of Plaintiffs' and class members' property;

u. Whether and what periods of time Perdue caused PFAS to enter, invade, intrude upon or injure the property rights of Plaintiffs and the Classes;

v. Whether the toxic invasion and accumulation of PFAS in class members' blood constitutes an injury under Maryland law;

w.  Whether Plaintiffs and the Classes are at increased risk of illness and harm as a result of the PFAS accumulation they have sustained in their bodies from using private well water;

x.  Whether medical monitoring and surveillance of Plaintiffs and the Classes is reasonable and necessary to assure early diagnosis and treatment of PFAS-related illnesses and conditions;

y.  Whether early diagnosis and treatment of the conditions caused by PFAS will be beneficial to Plaintiffs.

108.    The claims of the named Plaintiffs, who are representative parties, are typical of the claims of the members of the respective Classes.

109.    Plaintiffs will fairly and adequately represent and pursue the interests of the Class. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Class members.

110.    Plaintiffs' counsel are experienced in Class Actions and other complex litigation. Thus, Plaintiffs' counsel will adequately represent the interests of the Class.

111.    This action is properly maintainable as a Class Action pursuant to Federal Court Civil Rule 23(b)(2) in that the Defendants have refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

112.    This action is also properly maintainable as a Class Action pursuant to Federal Court Civil Rule 23(b)(3) in that questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of this controversy between the Classes and Perdue.

113.    The predominance of common issues of law and fact in this case is clear.  The questions of law and fact common to members of the Classes, set forth hereinabove, represent the overwhelming majority of evidence that must be presented in this case.

114.    The difficulties likely to be encountered in the management of a Class Action in this litigation are insignificant, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Classes through more than a thousand separate actions, which would necessarily include evidence and testimony relating to the conduct of Defendants and include testimony from a multitude of liability experts, and potentially tens of thousands of pages of exhibits.

115.    Plaintiffs and the Classes also seek a declaration that Perdue acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety of Plaintiffs and members of the Classes.

116.    In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the classes seek to maintain a class action with respect to particular issues, including: (1) Perdue's role in creating the aforementioned PFAS contamination; (2) the foreseeability of the subsequent injuries resulting from Perdue's conduct; (3) Perdue's abnormally dangerous activity related to the discharge or spray of PFAS from the Agribusiness Facility and whether Perdue is strictly liable for same; (4) whether the PFAS contamination from the Agribusiness Facility underlies contamination of the class region(s); (5) whether Perdue's conduct caused potential for the intrusion of PFAS into the air and potable water of class members; and (6) whether Perdue's failure to investigate its discharges, spray or disposal of PFAS was negligent.

117.    For the Class (c), the diagnosed illness Class, Plaintiffs seek to bring and maintain the action under Rules 23(b)(3) and 23(c)(4) as a class action with respect to all issues pertaining to the character of Perdue's conduct, damages for medical monitoring, and to general causation of the types of illness the Class (c) Plaintiffs allege have been suffered by Class (c) members.

## CAUSES OF ACTION

### COUNT I

### Strict Liability and Abnormally Dangerous Activity by Perdue Defendants

118.    Plaintiffs and class members incorporate by reference the allegations above as if fully stated herein.

119.    This Claim is brought under Maryland law.

120.    Defendants' manufacturing processes and negligent, reckless, and/or intentional handling of PFAS constituted an abnormally dangerous activity for which Defendants are strictly liable.

121.    Defendants' use and disposal of PFAS or PFAS containing material, as described herein, was inappropriate for the place where it was carried out, especially given the close proximity of the Agribusiness Facility to Maryland residents, schools, neighborhoods, churches, and other retail establishments, and to sources of potable water relied upon by residents of Salisbury and those utilizing its schools, neighborhoods, churches, and other retail establishments.

122.    Furthermore, Defendants' use and disposal of PFAS or PFAS containing material, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.

123.   As a result of Defendants' abnormally dangerous activities, Plaintiffs and class members have suffered harm to their properties and have suffered and continue to suffer injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

## COUNT II

## Negligence Against Perdue Defendants

124.   Plaintiffs and class members incorporate by reference the allegations above as if fully stated herein.

125.   This Claim is brought under Maryland law.

126.   Defendants knew or should have known that PFAS contained in materials used in the manufacturing process at Defendants' Agribusiness Facility would result in the release of PFAS into the environment, the contamination of the groundwater, ingestion of the groundwater by the surrounding communities, accumulation of PFAS in the bodies of members of those communities, including Plaintiffs and class members, and adverse health effects to those people, including Plaintiffs and class members.

127.   Defendants knew or should have known that the use and disposal of PFAS-containing materials into the air, ground, groundwater and surface water was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFAS was not released into the surrounding environment.

128.   Defendants had a duty to take all reasonable measures to ensure that PFAS would be effectively contained and not discharged into the surrounding environment.

129.   Defendants had a duty to ensure that the manufacturing processes it chose to employ did not unreasonably endanger the potable water relied upon by the residents of surrounding communities, including the Plaintiffs and class members.

130.   Defendants, including the Purdue Farms Defendants, Purdue Foods Defendants, and Purdue Agribusiness Defendants, breached their above-stated duties by unreasonably disposing of PFAS in a manner that guaranteed PFAS would enter the environment, including the groundwater ingested by Plaintiffs, class members and residents of the surrounding community.

131.   Defendants also breached their duty to warn Plaintiffs, class members, and the surrounding community of the dangers of releasing PFAS into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFAS exposure, the propensity of PFAS to cause environmental contamination of air, soil and potable water, and the bioaccumulation of PFAS in people who are exposed to PFAS.

132.   Had Defendants provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFAS to Plaintiffs, class members, and the surrounding community, it is more likely than not that the injuries and damages of Plaintiffs and class members would not have occurred or would have been lessened.

133.   Additionally, Defendant Perdue Farms breached its duties to properly train and supervise the employees of its subsidiaries to ensure that its subsidiaries complied with all federal, state, and local laws.

134.   As a result of Defendants' breaches of the various duties set forth above, the otherwise potable water in and around Salisbury, Maryland became contaminated with unsafe levels of PFAS which was ingested and used for other purposes by Plaintiffs and class members, resulting in the harms for which this action is brought.

135.   Upon information and belief, Defendants were grossly negligent, acted with reckless indifference to the health and safety of the public, and/or failed to prevent PFAS from

being released into the environment and failed to inform the Plaintiffs, class members, and surrounding community of the potential that its PFAS was contaminating their water supply.

136.    As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiffs and class members have suffered illnesses and injuries caused by the accumulation of PFAS in their bodies, entitling them to economic and non-economic compensatory and consequential damages, including the past, present and future cost of medical care; lost earnings and diminished earnings capacity; the cost of medical monitoring; the loss of property value; and severe mental anguish and psychological distress.

## COUNT III

### Private Nuisance Against Perdue Defendants

137.    Plaintiffs incorporate by reference the allegations above as if fully stated herein.

138.    This Claim is brought under Maryland law.

139.    Defendants, through their negligent, reckless, and/or intentional and unreasonable acts and omissions alleged herein, have contaminated Plaintiffs' and class members' land and potable water supply, including groundwater accessed through private wells.

140.    Defendants exercised sufficient ownership and/or control over their facilities and could have prevented the injuries suffered by Plaintiffs and class members.

141.    Through Defendants' control over the operation of their facilities and their handling and disposal of wastewater and other wastes, Defendants released toxic substances, including PFAS, into the environment.  These toxic substances, including PFAS, eventually migrated and contaminated Plaintiffs' and class members' land and private wells.

142.    These toxic substances are invasive and have substantially interfered with Plaintiffs' and class members' use and enjoyment of their properties, reduced their property values,

and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies.

143.    Defendants, aware of the adverse effects of these chemicals, had a duty to prevent the discharge of such toxic chemicals into the environment, as well as to prevent the toxic chemicals from escaping from their property into Plaintiffs' and class members' well water.

144.    Defendants owed a duty to take all reasonable and necessary care to prevent Plaintiffs' and class members' water wells from becoming contaminated with dangerous PFAS chemicals.

145.    Neither Plaintiffs nor class members consented to the invasion of toxic chemicals into their land or well water.

146.    Plaintiffs and class members have property rights and privileges with respect to the use and enjoyment of their properties, including, but not limited to, the water wells on their properties and a right to well water that is not contaminated with harmful chemicals and substances.

147.    Defendants owed a duty to proceed with all reasonable and necessary care to prevent Plaintiffs' and class members' well water from becoming contaminated with dangerous PFAS chemicals.

148.    The wrongful actions of Defendants in causing PFAS chemicals to contaminate Plaintiffs' and class members' land and well water, and Defendants' failure to disclose the presence thereof, created a substantial interference with the use and enjoyment of, and physical harm to, Plaintiffs' and class members' properties.

149.    The contamination of Plaintiffs' and class members' land and well water has interfered with their right to use and enjoy their properties. Indeed, this interference is substantial

in nature and has caused significant harm.  It has caused Plaintiffs and class members to, *inter alia*, refrain from using water to drink, cook, bathe, and for all other household purposes, which has, in turn, caused them significant inconvenience and expense. Defendants' interference with the physical condition of the Plaintiffs' and class members' properties has created a disturbance in the comfort and/or conveniences of the properties' occupants, including their peace of mind and threat of future injury that is a present menace and interference with enjoyment.

150.    Defendants' conduct has also substantially interfered with Plaintiffs' and class members' ability to avail themselves of their properties' value as an asset and/or source of collateral for financing, and to use their properties in the manner that Plaintiffs and class members so choose.

151.    Defendants' negligent, reckless, and/or intentional acts and omissions and interference with Plaintiffs' and class members' use and enjoyment of their properties were and continue to be substantial and unreasonable.

152.    Defendants' substantial and unreasonable interference with Plaintiffs' and class members' use and enjoyment of their properties constitutes a nuisance for which Defendants are liable.

## COUNT IV

### Public Nuisance Against Perdue Defendants

153.    Plaintiffs incorporate by reference the allegations above as if fully stated herein.

154.    This Claim is brought under Maryland law.

155.    Through Defendants' negligent, reckless, and/or intentional conduct described above, they have contaminated the public land, groundwater and surface waters in the area of Salisbury, Maryland.

32

156.    Defendants' conduct has and continues to unreasonably interfere with common rights enjoyed by the general public, specifically common rights and privileges with respect to the use and enjoyment of property, and access to safe, potable water.

157.    Defendants' conduct, as described above, has and continues to significantly interfere with public health, safety, peace, comfort, and convenience, as it has caused and continues to cause PFAS and other dangerous toxins to enter groundwater and surface waters in Wicomico County, Maryland and Salisbury, Maryland.

158.    Defendants' conduct has and continues to cause a significant adverse effect upon the public right, as it has and continues to produce the permanent and long-lasting effect of causing PFAS and other dangerous toxins to enter water supplied within Wicomico County, Maryland and the City of Salisbury, Maryland, which Defendants knew or should have known.

159.    Defendants exercised sufficient ownership and/or control over its facilities and wastewater and waste discharge and disposal, such that they could have prevented the injuries suffered by Plaintiffs and class members.

160.    Through its control over the operation of its facilities, the discharge and disposal of their wastewater and other wastes, Defendants discharged hazardous chemicals and toxic substances into the environment, including water supplies within Wicomico County, Maryland and the City of Salisbury, Maryland.

161.    Defendants' substantial and unreasonable interference with common rights enjoyed by the general public constitutes a nuisance for which they are liable.

162.    Neither Plaintiffs nor the class members consented to the invasion of toxic chemicals into the public lands, groundwater, and surface waters of Wicomico County, Maryland and the City of Salisbury, Maryland.

163.     Plaintiffs and class members have a right to the use and enjoyment of their property and public land, groundwater and waterways, and a right to potable water that is not contaminated with harmful chemicals and substances.

164.     The right to use and enjoy one's property is a right common to the general public.

165.     The right to potable water that is not contaminated with harmful chemicals and substances is a right common to the general public.

166.     Plaintiffs and class members have suffered a harm that is different in kind from others similarly situated within the general public as Plaintiffs' and class members' potable and public water sources are contaminated with PFAS chemicals.

## COUNT V

## Trespass By Perdue Defendants

167.     Plaintiffs and class members hereby incorporate by reference the allegations set forth as if fully stated herein.

168.     This Claim is brought under Maryland law.

169.     PFAS chemicals are harmful and noxious substances.

170.     Defendants had connections with and control over the release of PFAS into the air and water in and around Plaintiffs' and Class Members' real properties.

171.     Plaintiffs and Class Members of the Property Class each own, occupy, and/or possess real property in and around Salisbury, Maryland.

172.     Through Defendants' negligent, reckless, and/or intentional conduct described above, it has caused and continues to cause PFAS to enter onto the real properties owned, occupied, and/or possessed by Plaintiffs and Class Members in that the wells and lands located on said real properties are contaminated with PFAS chemicals.

173.     Defendants' negligent, reckless, and/or intentional conduct described above has and continues to interfere with Plaintiff's and Class Members' use, possession, and enjoyment of their real properties in that Defendants' conduct has reduced their property value and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies, and reduced or eliminated their use and enjoyment of their properties.

174.     The entry and deposit of PFAS chemicals onto said real properties of Plaintiffs by Defendants was done without the authority, permission, and/or consent of Plaintiffs.

175.     Defendants' entry and deposit of PFAS chemicals onto said real properties of Plaintiffs and Class Members has proximately caused damages to Plaintiffs and Class Members.

## COUNT VI

### Vicarious Liability Against Perdue Farms Defendants

176.     Plaintiffs and class members hereby incorporate by reference the allegations contained in the proceeding paragraphs of this Complaint as if they were set forth at length herein.

177.     Upon information and belief, Defendants Perdue Agribusiness and Perdue Foods are wholly-owned subsidiaries of Defendant Perdue Farms.

178.     Defendants Perdue Agribusiness and Perdue Foods were acting as Defendant Perdue Farms' actual or apparent agent when the Agribusiness Facility contaminated the groundwater as described *inter alia*.

179.     Defendant Perdue Farms had, or appeared to have, control over Defendants Perdue Agribusiness and Perdue Foods through its relationship as the parent company.

180.     Defendant Perdue Farms is vicariously liable for the actions of its subsidiaries, Defendants Perdue Agribusiness and Perdue Foods.

181.    This vicarious liability stands in addition to Defendant Perdue Farms' liability for its own negligent conduct, as set forth above, which was a but-for, proximate, or substantial factor in causing Plaintiffs' and class members' injuries, having set in motion a series of events that resulted in the alleged harm.

**COUNT VII**

**Preliminary And Permanent Injunction To Cease Pollution And Remediate The Environment**

182.    Plaintiffs and class members hereby incorporate by reference the allegations contained in the proceeding paragraphs of this Complaint as if they were set forth at length herein.

183.    An injunction should issue to prevent Defendants from producing, releasing, discharging, spraying, emitting, dispersing, or otherwise engaging in conduct that causes a release or emission of any PFAS and/or other harmful contaminants into the Contamination Zone in which Plaintiffs and class members live, work, visit, frequent, and/or otherwise enjoy, by entering an Order requiring Defendants:

    a.   To immediately cease and desist, or substantially reduce, daily spray irrigation amounts;

    b.   To immediately cease and desist the production, release, spray, emission, discharge, and/or dispersion of PFAS and/or other harmful contaminants into the ground, groundwater and/or surface water surrounding, in, or adjacent to the Contamination Zone;

    c.   To immediately become compliant with any and all applicable federal, state, and local laws, regulations, permits, licenses, and orders related to the production, release, spray, emission, discharge, and/or dispersion of PFAS and/or other harmful

contaminants into the ground, groundwater, and/or surface water surrounding, in, or adjacent to the Contamination Zone;

d.  To perform any other act or action that the discovery may reveal to address the Perdue Defendants' conduct causing contamination to the ground, groundwater, and/or surface water by the Agribusiness Facility.

184.   To obtain an injunction, Plaintiffs must demonstrate that the relief requested is reasonably needed to preserve the parties' rights during the litigation and that they (1) would suffer irreparable harm if the injunction is not granted; (2) that they will likely succeed on the merits of the litigation; and (3) there is an inadequate remedy at law.

185.   Plaintiffs will suffer irreparable harm if an injunction does not issue in that they will:

a.  Continue to suffer any and all adverse health effects caused by Defendants' production, release, spray, emission, discharge, and/or dispersion of PFAS and/or other harmful pollutants into the ground, groundwater, and/or surface water surrounding, in, or adjacent to the Contamination Zone;

b.  Continue to suffer the loss of the use and enjoyment of their property caused by Defendants' nuisance and trespass related to the Agribusiness Facility's production, release, spray, emission, discharge, and/or dispersion of PFAS and/or other harmful pollutants into the ground, groundwater, and/or surface water surrounding, in, or adjacent to the Contamination Zone;

c.  As a result of Defendants' negligence in failing to prevent the pollution and contamination of the ground, groundwater, and/or surface water used by Plaintiffs

and by negligently failing to contain and properly remediate the sources of such contamination, Plaintiffs have sustained damages and injuries as herein alleged;

d.   Defendants' contamination constitutes a nuisance which has resulted in the injuries and damages to Plaintiffs and Plaintiffs' properties described herein; and

186.   Absent a Court Order enjoining Defendants' conduct, Plaintiffs have no adequate remedy to immediately prevent Defendants from the producing, releasing, spraying, emitting, discharging, and/or dispersing of PFAS and other harmful contaminants into the ground, groundwater, and/or surface water surrounding, in, or adjacent to the Contamination Zone, as legal relief in the form of money damages is insufficient to prevent the Perdue Defendants from continuing their conduct.

## **RELIEF SOUGHT BY PLAINTIFFS AND CLASS MEMBERS**

187.   Plaintiffs and class members hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

188.   Plaintiffs and class members have sustained and will continue to sustain damages to their property and health as a result of Defendants' actions and failure to take action. As a result, Plaintiffs and the class members seek monetary damages for each violation and tortious act or omission set forth in this Complaint.

189.   Plaintiffs and the class members seek monetary damages to compensate class members for the diminution in value of their property caused by Defendants' conduct.

190.   Plaintiffs and the class members seek monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendants' conduct.

191.    Plaintiffs and the class members seek monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

192.    Plaintiffs and the class members seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFAS to Plaintiffs and the class members.

193.    Plaintiffs and the class members seek injunctive relief requiring Defendants to remediate and/or pay for the remediation of the PFAS contamination on their properties, including providing adequate treatment of their water supplies and/or a safe alternative water supply.

194.    In addition to the above, Plaintiffs and the class members seek injunctive relief to establish a biomonitoring protocol for class members of the Class (c) to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA.

195.    Leave to amend this Complaint to conform to the evidence produced at trial.

196.    For all other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper, whether compensatory, punitive, or declaratory.

*Signature block on following page.*

BAIRD MANDALAS BROCKSTEDT
& FEDERICO, LLC

/s/ *Philip C. Federico*
Philip C. Federico, Fed ID No. 01216
Chase T. Brockstedt (*pro hac vice* forthcoming)
Brent P. Ceryes, Fed ID No. 19192
A. Wray Fitch, IV, Fed ID No. 19722
Catherine M. Cramer (*pro hac vice* forthcoming)
Matthew P. Legg, Fed ID No. 19904
Stella D. Pratt (*pro hac vice* forthcoming)
2850 Quarry Lake Drive, Suite 220
Baltimore, MD 21209
Tel: 410-421-7777
Fax:  443-241-7122
pfederico@bmbfclaw.com
chase@bmbfclaw.com
bceryes@bmbfclaw.com
wfitch@bmbfclaw.com
ccramer@bmbfclaw.com
mlegg@bmbfclaw.com
spratt@bmbfclaw.com

*Attorneys for Plaintiffs*


DATED: October 11, 2024