**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| RACHEL M. CHANEY, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>PERDUE FARMS INC., *et al.*,<br><br>Defendants. | C.A. No.: 1:24-cv-02975 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO TERMINATE THE STAY OF DEADLINES AND FOR SANCTIONS**

**TABLE OF CONTENTS**


Table of Authorities ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The Parties Agree to Deadlines and Begin Discovery. ..... 2

II. The Parties Agree to Mediate, and Deadlines Are Stayed. ..... 3

III. Perdue Timely Seeks to Implead Johnson Controls and 3M and the Parties Prepare for Mediation. ..... 4

IV. Perdue Recognizes Mediation Will No Longer Be Productive. ..... 6

V. Plaintiffs' Counsel Baselessly Accuse Perdue of Bad Faith—And Publicize It. ..... 7

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

I. Plaintiffs' Speculative Accusations About Perdue's Motives Do Not Show that Perdue Engaged in Sanctionable Conduct. ..... 9

A. Plaintiffs' Arguments Are Legally Baseless. ..... 10

B. The Facts Show Perdue Acted in Good Faith. ..... 13

C. Impleading Third Parties Does Not Constitute Misconduct and Preparing for the Case to Continue Does Not Suggest Bad Faith. ..... 14

II. Manufactured Harm Does Not Entitle Plaintiffs to Relief. ..... 17

A. The Governing Standard Is But-For Causation, Not Generalized "Prejudice." ..... 17

B. Perdue's Conduct Has Not Harmed Plaintiffs. ..... 18

C. Plaintiffs Benefitted From the Stay. ..... 22

III. Sanctions Would Be Warranted in Response to Plaintiffs' Counsel's Unjustified Sanctions Motion Pursuant to Local Rule 105.8(a). ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.T. Reynolds & Sons, Inc.*,
452 B.R. 374 (S.D.N.Y. 2011)....................12

*Adams v. Whitestone Grp., Inc.*,
No. 21-cv-03120, 2023 WL 2712587 (D. Md. Mar. 30, 2023)....................21

*United States v. Allergan, Inc.*,
No. 17-cv-00668-SAG, 2024 WL 2882125 (D. Md. May 30, 2024)....................11

*Atkins Nuclear Secured, LLC v. Aptim Fed. Servs., LLC*,
No. 18-cv-1112, 2019 WL 2480045 (E.D. Va. Mar. 5, 2019)....................8, 11

*Bioiberica Neb., Inc. v. Nutramax Mfg.*,
No. 18-cv-03133-SAG, 2021 WL 1840292 (D. Md. May 7, 2021)....................9, 17

*Blue v. U.S. Dep't of Army*,
914 F.2d 525 (4th Cir. 1990)....................24

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................11

*Cook v. Am. S.S. Co.*,
134 F.3d 771 (6th Cir. 1998)....................2

*Dawson v. United States*,
68 F.3d 886 (5th Cir. 1995)....................12

*Fair Hous. Council of Greater Wa. v. Landow*,
999 F.2d 92 (4th Cir. 1993)....................19

*Fidrych v. Marriott Int'l, Inc.*,
952 F.3d 124 (4th Cir. 2020)....................8, 12

*Fitch v. St. Paul's Sch. for Girls*,
No. 24-cv-00938-SAG, 2025 WL 1346605 (D. Md. May 8, 2025)....................24

*Francis v. Women's Obstetrics and Gynecology Group, P.C.*,
144 F.R.D. 646 (W.D.N.Y. 1992)....................12

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017).................... *passim*

*Guillen v. Armour Home Improvement, Inc.*,
No. 19-cv-2317-DLB, 2024 WL 1346838 (D. Md. Mar. 29, 2024)................................18, 19

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) ......................................................................................9, 12

*Jensen v. Phillips Screw Co.*,
546 F.3d 59 (1st Cir. 2008)..............................................................................................2

*In re Keegan Mgmt. Co., Sec. Litig.*,
78 F.3d 431 (9th Cir. 1996) ............................................................................................11

*Keyes Law Firm, LLC v. Napoli*,
120 F.4th 139 (4th Cir. 2024) ...................................................................9, 11, 17, 18

*Life Techs. Corp. v. Govindaraj*,
931 F.3d 259 (4th Cir. 2019) ..........................................................................................12

*May v. Gale Tschuor Co.*,
No. 08-cv-172, 2009 WL 3763161 (N.D. Ind. Nov. 6, 2009) ..........................................10

*Prairie River Home Care, Inc. v. Procura, LLC*,
No. 17-cv-5121, 2019 WL 13248862 (D. Minn. Aug. 5, 2019)........................................10

*Procaps S.A. v. Patheon Inc.*,
No. 12-cv-24356, 2015 WL 3539737 (S.D. Fla. June 4, 2015)........................................10

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017) ......................................................................................11

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ..........................................................................................17

*Sentis Grp., Inc. v. Shell Oil Co.*,
559 F.3d 888 (8th Cir. 2009) ............................................................................................2

*United States v. Shaffer Equip. Co.*,
11 F.3d 450 (4th Cir. 1993) ............................................................................................11

*United States v. Trump*,
No. 23-cv-256-TSC, 2024 WL 194739 (D.D.C. Jan. 18, 2024).......................................15

*Xquisite Transp., LLC v. Travelers Indem. Co.*,
No. 08 cv-2905-WDQ, 2009 WL 3246960 (D. Md. Oct. 2, 2009)....................................15

**Other Authorities**

Fed. R. Civ. P. 11 ..........................................................................................................8

Fed. R. Civ. P. 14(a)(1) ........................................ 15

Fed. R. Civ. P. 37 ........................................ 17

Fed. R. Evid. 408(b) ........................................ 2

Local Rule 105.8(a) ........................................ 2, 24, 25

Defendants (collectively, "Perdue") oppose Plaintiffs' Motion to Terminate the Stay of Deadlines and for Sanctions (ECF 91) (the "Motion").[1]

## INTRODUCTION

Shoot first, ask questions later. Plaintiffs' counsel, clearly disappointed that their mediation strategy failed to extract a quick and unjustifiably large payout, and eager to drop yet another inflammatory press release, have crossed the line. A single question by Plaintiffs' counsel would have revealed that Perdue spent nearly 160 attorney hours (equal to more than $134,000 in fees) preparing for mediation before making the difficult, but prudent, decision to call off a process that Plaintiffs' counsel had made futile. It was Plaintiffs' counsel, not Perdue, who wasted everyone's time by repeatedly refusing to grapple with the gaping holes in their case and instead stubbornly focusing on Perdue just handing over a "bag of money." But the Court's inherent authority is not a vehicle for extracting a refund for a failed negotiation strategy or filling the coffers of overly zealous attorneys.

Plaintiffs point to two ordinary litigation activities to justify the extraordinary accusation that Perdue acted in bad faith during the mediation process: (1) Perdue filed motions to implead third parties, and (2) Perdue decided not to continue with voluntary mediation. Neither of these actions constitute bad faith or sanctionable conduct.

What *does* constitute sanctionable conduct, however, is bringing a sanctions motion without adequately investigating the law or the facts. The law on mediation-related sanctions (including the very cases Plaintiffs cite) cuts against Plaintiffs' Motion and the evidentiary

[1] The request to terminate the stay is moot because the stay was lifted on August 3, 2026, when the Parties filed their Joint Status Report. ECF 92. In any event, Defendants did not oppose lifting the stay and informed Plaintiffs' counsel it did not oppose before Plaintiffs filed the present Motion. Ex. 1 (Declaration of J. Douglas Baldridge) ("Baldridge Decl.") ¶ 7.

threshold is high. Plaintiffs' counsel should have known better than to seek sanctions based on speculation and without first asking the most basic questions. Local Rule 105.8(a) allows the Court to impose sanctions against Plaintiffs' counsel under these circumstances, but at this time, Perdue is focused on moving the present litigation forward and does not seek reimbursement for the time and attorneys' fees spent defending against Plaintiffs' frivolous Motion.

## BACKGROUND

In response to the Motion's incomplete background section, Perdue provides the following factual background, supported by declarations, communications, and court filings.[2]

### I. The Parties Agree to Deadlines and Begin Discovery.

On September 18, 2025, the Court granted the Parties' joint request to modify the scheduling order. ECF 53 (modifying ECF 49). The Court set a May 1, 2026, deadline for moving for both joinder of additional parties and amendment of pleadings. *Id.*

In early November 2025, Perdue agreed to allow Plaintiffs' counsel an extension on their responses to Perdue's discovery requests because Plaintiffs' counsel represented that they would

---

[2] The nature of the accusations requires a thorough examination of mediation documents, and, prior to sharing this typically private information, Perdue looked for any prohibitions against disclosure and found none. The confidentiality requirements in the Local Rules do not apply to non-court ordered mediations. *See* Loc. R. 607(4) ("*The Court's* ADR process is confidential." (emphasis added)). Additionally, the parties did not execute a confidentiality agreement with the mediator. *See* Ex. 2 (Declaration of Elizabeth C. Rinehart) ("Rinehart Decl.") ¶ 17. The Stipulated Confidentiality Agreement applies only to "documents produced in the course of *discovery*," ECF 59 at 1 (emphasis added). Finally, the Federal Rules of Evidence "do not necessarily apply in the context of a motion for sanctions," *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 901 (8th Cir. 2009); *accord Jensen v. Phillips Screw Co.*, 546 F.3d 59, 66 n.5 (1st Cir. 2008); *Cook v. Am. S.S. Co.*, 134 F.3d 771, 774 (6th Cir. 1998), but regardless, Perdue offers such evidence for the permissible purpose of "negating a contention of undue delay," Fed. R. Evid. 408(b).

Nevertheless, to strike a balance between respecting the spirit of what should have remained private and what is necessary to respond to the allegations levied against it, Perdue discusses the mediation process, communications, and materials only to the extent necessary, and submits the private mediator's communications under seal.

be filing a motion to amend their complaint that would substitute certain named plaintiffs. ECF 89-3 at 1. Specifically, while Plaintiff Rachel M. Chaney would still be required to timely respond, Perdue agreed to allow the other four named Plaintiffs to respond to Perdue's requests within 14 days following an order permitting the filing of Plaintiffs' forthcoming motion to amend the complaint. *Id.* To date, Plaintiffs have not filed a motion to amend the complaint, and none of the other four named Plaintiffs has responded to Perdue's written discovery requests.

On February 20, 2026, Ms. Chaney produced documents to Perdue, consisting of 1,135 pages of medical records. Ex. 2 (Rinehart Decl.) ¶ 29. Plaintiffs also produced third-party documents from various government entities. *Id.* On February 27 and March 5, 2026, Perdue produced 8,692 pages of documents to Plaintiffs. *Id.* ¶ 30. To date, Perdue has also produced to Plaintiffs three productions responsive to third-party subpoenas, totaling an additional 115,283 pages of documents. *Id.* ¶ 32.

## II. The Parties Agree to Mediate, and Deadlines Are Stayed.

In February 2026, at Plaintiffs' request, the Parties began discussing the possibility of a private, voluntary mediation. Ex. 2 (Rinehart Decl.) ¶ 6. In a call on March 12, 2026, counsel openly discussed whether third-party Johnson Controls (whom Perdue had not yet sought to implead) would be a part of the mediation. *Id.* ¶ 7; Ex. 1 (Baldridge Decl.) ¶ 10.[3] On March 19, 2026, the Court granted the Parties' request for a 45-day stay of all deadlines to allow conferral with a mediator on whether mediation would be appropriate at this stage. ECF 61. The Parties

[3] Plaintiffs' counsel complain that "[a]t no point during the pre-mediation process" were they informed of Perdue's intention to add third-party defendants, and that "Perdue had not previously advised Plaintiffs that it intended to seek leave to add Johnson Controls or 3M as third-party defendants." *See* ECF 91-1 at 5, 6. But the Parties discussed the possibility of Johnson Controls participating in the mediation in March, and in any event, Perdue's counsel informed Plaintiffs' counsel of its intent to implead Johnson Controls on May 6. *See* Ex. 2 (Rinehart Decl.) ¶ 7, ¶10; Ex. 1 (Baldridge Decl.) ¶ 11.

submitted pre-mediation statements to the Honorable William G. Connelly (Ret.) in April 2026, with Plaintiffs submitting first and Perdue submitting two days later in response. Ex. 2 (Rinehart Decl.) ¶ 8. Plaintiffs' counsel's pre-mediation statement focused on damages calculations, ECF 91-1 at 5, while the section on liability consisted of a single sentence that referenced only Plaintiffs' counsel's engagement of experts. Ex. 2 (Rinehart Decl.) ¶ 9. Perdue's pre-mediation statement noted in response that Perdue was concerned with Plaintiffs' counsel's valuation of their claims and that, for mediation to be productive, Plaintiffs' counsel would need to address a number of threshold liability issues rather than damages calculations alone. *Id.* ¶ 10. On May 5, 2026, the Court granted the Parties' joint request for a stay of all deadlines through August 3, 2026, to allow the Parties to focus on the upcoming mediation. ECF 62; 63. The Parties agreed that the stay would not prohibit either party from seeking third-party discovery, ECF 62, and during the stay, Plaintiffs' counsel noticed 11 different third-party subpoenas. Ex. 2 (Rinehart Decl.) ¶ 33.

### III. Perdue Timely Seeks to Implead Johnson Controls and 3M and the Parties Prepare for Mediation.

On May 6, 2026, Perdue's counsel called Plaintiffs' counsel, informing him that Perdue planned to file a motion to implead Johnson Controls. Ex. 2 (Rinehart Decl.) ¶ 11. Plaintiffs' counsel asked why Perdue could not just wait until the stay lifted to file the motion. *Id.* at ¶ 12. Perdue's counsel explained that waiting that long would allow Plaintiffs' counsel (and potentially Johnson Controls) to argue that they were prejudiced by the delay. *Id.* Plaintiffs' counsel offered to stipulate that there was no prejudice to Plaintiffs from the third-party filing on the condition that Perdue wait until the stay was lifted. *Id.* He was concerned that adding Johnson Controls would muddle the case (from his perspective) as it might result in the matter being transferred to the multi-district litigation. *Id.* Ultimately, Perdue filed motions for leave to file third-party

complaints against Johnson Controls and 3M two days later, on May 8. ECF 64; ECF 71. Plaintiffs opposed. ECF 87; ECF 88. As of the date of this filing, the motions remain pending.

Perdue's counsel and Plaintiffs' counsel again discussed the mediation and third-party complaints on May 11 and June 3. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 13. In these discussions, Perdue's counsel explained that Perdue did not anticipate third parties participating in the mediation but noted that Perdue would not be offended if Plaintiffs decided they did not want to proceed to mediation. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶¶ 14-15. Nevertheless, neither party indicated they no longer intended to mediate. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 15. Instead, the dialogue took on an unusual turn—Plaintiffs' counsel boasted about his skills extracting funds from companies like the third parties and stated that if Perdue gave him a "bag of money," he would help Perdue pursue the third parties. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 16.

Meanwhile, on May 14, 2026, the Parties scheduled mediation with Judge Connelly for July 27-29, and Judge Connelly provided a pre-mediation letter instructing the Parties on the format and content of their mediation statements. Ex. 2 (Rinehart Decl.) ¶ 17. Counsel for Perdue contacted Plaintiffs' counsel, explaining Perdue's position that, per Judge Connelly's request, the Parties should each submit their mediation statements simultaneously a week prior to the mediation, rather than a two-step procedure, involving opening statements and replies, as the Parties had previously discussed. *Id.* ¶ 18.

Plaintiffs' counsel stated they were "focused on getting Perdue as much information as possible as soon as possible" and expressed a preference for a procedure in which each party submitted an initial statement and a reply. *Id.* ¶ 19. Perdue's counsel stated that while Perdue would look at any materials Plaintiffs' counsel wanted to share, she did not think it advisable for

either party to spend time or money putting a briefing together that went above and beyond what Judge Connelly requested. *Id.* ¶ 20. By June 9, the Parties had agreed that Plaintiffs would provide their statement on June 29, and Perdue would provide its statement on July 13. *Id.* ¶ 21.

Shortly before Plaintiffs' mediation statement was due, Plaintiffs' counsel contacted Judge Connelly, without Perdue's counsel, to discuss Plaintiffs' counsel's goal of resolving all four of their damages categories and whether Perdue would like to discuss all the categories at once or discuss each separately. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 22. Plaintiffs' counsel also expressed concern regarding Perdue's third-party claims. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 22. On June 29, Perdue's counsel spoke with Judge Connelly about Plaintiffs' counsel wanting the mediation to focus on damages, even though they were aware, particularly after the pre-mediation statements, of Perdue's position that liability was a threshold issue. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 23. Perdue's counsel reiterated Perdue's position that the mediation could not focus exclusively on damages. Ex. 1 (Baldridge Decl.) ¶ 10; Ex. 2 (Rinehart Decl.) ¶ 23.

## IV. Perdue Recognizes Mediation Will No Longer Be Productive.

Plaintiffs provided their mediation statement on June 29. Ex. 2 (Rinehart Decl.) ¶ 24. As Plaintiffs admit, "none of the information contained in Plaintiffs' mediation statement was materially different from the information contained in Plaintiffs' pre-mediation vetting statement." ECF 91-1 at 2. Though Judge Connelly requested that the mediation statements include an analysis of each party's case, including strengths and weaknesses, *see* Ex. A to Rinehart Decl. (Judge Connelly's Pre-Mediation Letter), Plaintiffs' mediation statement did no such thing. Instead, Plaintiffs' counsel ignored the substantial issues regarding causation, breezed over the likely alternative sources of PFAS unrelated to Perdue, and essentially concluded that Perdue was liable for an exorbitant amount of money damages because Plaintiffs' claims had survived a motion to

dismiss.[4] Ex. 2 (Rinehart Decl.) ¶ 25. Still, Perdue continued to prepare for mediation. Through July 7, Perdue's counsel spent nearly 160 hours preparing for mediation, including drafting, discussing, and revising Perdue's mediation statement. *Id.* ¶¶ 36-38. This work is valued at more than $134,000. *Id.* ¶ 37. Plaintiffs' counsel would have known this had they done minimal due diligence before making the reckless allegation that Perdue never intended to mediate.

Ultimately, Perdue determined that, consistent with its pre-mediation statement warning that there could be no resolution if Plaintiffs' counsel did not engage with liability issues, it would not participate in mediation at this time. *Id.* ¶ 27. Perdue's counsel informed Plaintiffs' counsel of Perdue's decision on July 11, after first informing Judge Connelly the day prior. Ex. 1 (Baldridge Decl.) ¶ 10; *see* Ex. D to Rinehart Decl. (July 10 and 11 Email Correspondence). Then, on July 22, Perdue's counsel spoke with Plaintiffs' counsel. Ex. 1 (Baldridge Decl.) ¶ 5. Perdue's counsel explicitly left open the possibility for mediation in the future, perhaps after further discovery. *Id.* ¶ 6. Perdue's counsel also agreed with Plaintiffs' counsel that the stay should be lifted. *Id.* ¶ 7. In response, Plaintiffs' counsel never mentioned the possibility of seeking sanctions and did not ask a single question about Perdue's efforts to prepare for the mediation, but stated only that Plaintiffs were assessing the situation and would decide upon their next steps within "the next week or so." *Id.* ¶ 8. Thereafter, Plaintiffs' counsel made no effort to contact Perdue's counsel or undertake minimal due diligence before filing the Motion.

## V. Plaintiffs' Counsel Baselessly Accuse Perdue of Bad Faith—And Publicize It.

On July 28, and without so much as a simple inquiry or notice, Plaintiffs took the extraordinary step of asking this Court to sanction Perdue, claiming Perdue acted in bad faith by

[4] Plaintiffs also included personal injury damages. *See* ECF 91-1 at 9. The Court dismissed Plaintiffs' personal injury claims in August 2025, ECF 44 at 7-8, and Plaintiffs' counsel have yet to amend their complaint, as discussed above.

canceling the mediation sessions. *See id.* ¶ 9; Ex. 2 (Rinehart Decl.) ¶ 28. The day after filing, Plaintiffs' counsel used the Motion to drop an inflammatory and unsupported press release pushing their false narrative that Perdue had abused the mediation process. *See Plaintiffs seek sanctions against Perdue following canceled PFAS mediation talks*, WBOC (July 29, 2026) https://www.wboc.com/news/plaintiffs-seek-sanctions-against-perdue-following-canceled-pfas-mediation-talks/article_7ee89e27-3532-4d28-82f2-5aa7b1e5adfc.html (claiming that "Perdue never had any serious intention of resolving this case in good faith" (emphasis omitted)). Plaintiffs' counsel also updated their website to represent as "facts" that "Perdue has used mediation efforts in order to delay and deflect accountability." *See Myth v. Fact*, Brockstedt Mandalas Federico, https://perduepollution.com/myth-v-fact (last visited July 31, 2026).

The only "fact" here is that the Motion is frivolous. Plaintiffs' counsel should have spared the Parties and the Court this unnecessary charade.

## LEGAL STANDARD

Although the court has the inherent power to issue sanctions, "[s]anctions may be awarded only in the face of misconduct of some sort." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 146 (4th Cir. 2020) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)). In addition to a finding of actual misconduct, "[c]ourts within the Fourth Circuit have stated that sanctions pursuant to their inherent authority require a higher bad faith standard than the objective standard applied under Rule 11 or § 1927." *See Atkins Nuclear Secured, LLC v. Aptim Fed. Servs., LLC*, No. 18-cv-1112, 2019 WL 2480045, at *4 (E.D. Va. Mar. 5, 2019), *report and recommendation adopted*, 2019 WL 1793137 (E.D. Va. Apr. 24, 2019). Sanctions pursuant to a

court's inherent authority should address "fraud, deceit, misrepresentation, harassment, and unethical conduct." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 281 (4th Cir. 2022).

"The Supreme Court has noted both that this inherent power to sanction by an award of fees 'must be exercised with restraint and discretion,' and that the set of circumstances justifying an award of attorneys' fees under a federal court's inherent power as a sanction for bad faith is narrow." *Bioiberica Neb., Inc. v. Nutramax Mfg.*, No. 18-cv-03133-SAG, 2021 WL 1840292, at *1 (D. Md. May 7, 2021) (first quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980), then citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013)). Additionally, a sanction of fees is limited to the fees the innocent "party would not have incurred but for the bad faith." *Goodyear Tire & Rubber*, 581 U.S. at 103-04. The Fourth Circuit has reaffirmed this standard, holding that the court "must 'establish a causal link' between the sanctioned behavior and the fees awarded." *Keyes Law Firm, LLC v. Napoli*, 120 F.4th 139, 145 (4th Cir. 2024) (quoting *Goodyear Tire & Rubber*, 581 U.S. at 108).

## ARGUMENT

### I. Plaintiffs' Speculative Accusations About Perdue's Motives Do Not Show that Perdue Engaged in Sanctionable Conduct.

Lacking actual evidence, Plaintiffs strain to drum up a "course of conduct," by denigrating ordinary litigation activities with speculative accusations that Perdue "induced" Plaintiffs to prepare for the mediation and thus engaged in "bad-faith abuse" of that process. ECF 91-1 at 12, 15. Plaintiffs' bad faith accusations stem solely from (1) Perdue cancelling a voluntary, private mediation (at this time) after deciding it would not be productive without further case developments, and (2) Perdue filing motions to implead two third parties during the stay. ECF 91-1 at 12-15. Neither action comes close to the high bar required to demonstrate sanctionable

misconduct evincing bad faith, and Perdue's decision to cancel a voluntary mediation two months after impleading third parties hardly represents a "course of conduct." ECF 91-1 at 12.

**A. Plaintiffs' Arguments Are Legally Baseless.**

There is no order of the court, rule, or statute that required Perdue to move forward with this mediation. For that obvious reason, no sanction is warranted. *See, e.g.*, *Order Denying Mot. to Compel Participation in Mediation or for Sanctions*, Williams v. Curtis, No. 12-cv-00716 (D.N.M. Feb. 27, 2014), ECF 190 (reasoning that local rules did not apply where parties asked the Court if they could attend a private mediation, and thus sanctions would not issue for failure to attend mediation).

Some courts (but not this one) have local rules or standing orders requiring litigants to participate in some sort of alternative dispute resolution. Much of the caselaw surrounding sanctions for mediation-related conduct thus centers on an alleged failure to comply with an order. *See Procaps S.A. v. Patheon Inc.*, No. 12-cv-24356, 2015 WL 3539737, at *1 (S.D. Fla. June 4, 2015); *Prairie River Home Care, Inc. v. Procura, LLC*, No. 17-cv-5121, 2019 WL 13248862, at *28 (D. Minn. Aug. 5, 2019); *May v. Gale Tschuor Co.*, No. 08-cv-172, 2009 WL 3763161, at *2 (N.D. Ind. Nov. 6, 2009). In determining whether a litigant violated an order, courts look to objective facts; courts cannot and do not examine a litigant's subjective good or bad faith. *See Procaps S.A.*, 2015 WL 3539737, at *11 ("[T]he Court is unwilling to probe the parties' strategies to determine whether a particular mediation-related position constitutes a lack of good faith. Peeling back the layers of a party's comments, positions and/or offers before and during mediation would be a slippery slope indeed.").

By contrast, courts relying on their inherent authority to impose sanctions typically require a higher showing of bad faith than the objective standard that governs sanctioning authority pursuant to rules or statutes; rather, courts often look for *subjective* bad faith or some intent to

mislead. *See United States v. Allergan, Inc.*, No. 17-cv-00668-SAG, 2024 WL 2882125, at *9 (D. Md. May 30, 2024); *Atkins Nuclear Secured*, 2019 WL 2480045, at *5 (collecting cases); *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("[T]he inherent-powers standard is a subjective bad-faith standard."); *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) (stating that recklessness is "an insufficient basis for sanctions under a court's inherent power"). While a party seeking sanctions need not provide "direct evidence" of subjective bad faith, it must at least show that the conduct is "so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224-25.

Notably, Plaintiffs' memorandum directly cites a total of three cases, none of which support that Perdue's conduct here amounted to sanctionable bad faith. First, unlike here, the conduct in two of those cases involved violations of court orders, meritless litigation, and other forms of obvious misconduct. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 36-41 (1991) (describing sanctioned conduct that included attempting to fraudulently transfer property to deprive the court of jurisdiction, filing false pleadings, meritless motions, seeking unnecessary depositions, and violating a preliminary injunction); *Keyes Law Firm*, 120 F.4th at 142 (describing sanctioned conduct that included filing lawsuits in state court to halt federal proceedings, repeatedly defying court orders, and filing frivolous motions). Second, in the case upon which Plaintiffs primarily rely, this Court declined to issue sanctions altogether. *See United States v. Allergan, Inc.*, No. 17-cv-00668-SAG, 2024 WL 2882125, at *9 (D. Md. May 30, 2024) (declining to impose sanctions under inherent authority where first amended complaint asserted false statement because record did not show "clear and convincing evidence" of "subjective bad faith" or "intent to mislead").

Even the cases indirectly cited in the Motion do not help Plaintiffs' counsel's arguments, on either the facts or the holdings. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th

Cir. 1993) (finding inherent power sanctions warranted but reversing dismissal as too extreme of a sanction, despite finding of deliberate, bad-faith candor violations); *Goodyear Tire & Rubber*, 581 U.S. at 103-05 (reversing large inherent power sanctions award in case involving proven discovery misconduct, and holding that sanctions must be strictly compensatory); *Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (vacating large monetary judgment, despite non-party's repeated violations of court orders, where non-party was not afforded due process); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 147 (4th Cir. 2020) (vacating district court's denial of inherent power sanctions for failure to timely answer complaint where district court failed to explain its rulings); *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 280-81 (4th Cir. 2022) (vacating inherent power sanctions that were based on one unsuccessful amended complaint and reiterating that sanctions require a strong showing of bad faith).

There is simply no legal support for Plaintiffs' position. Nothing required Perdue to move forward and spend fee on a private mediation once Plaintiffs' counsel's conduct showed it would not make sense at this time. To find otherwise, as Plaintiffs' demand, would essentially be to compel or coerce Perdue into mediating.[5]

[5] There is good reason for court reticence in imposing sanctions in the mediation context, as fear of sanctions based on an amorphous and subjective good faith standard in mediation may impermissibly coerce non-consenting parties towards settlement. *See Francis v. Women's Obstetrics and Gynecology Group, P.C.*, 144 F.R.D. 646, 647 (W.D.N.Y. 1992); *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 382 (S.D.N.Y. 2011); *Dawson v. United States*, 68 F.3d 886, 897-98 (5th Cir. 1995) (reversing sanctions award when trial court treated making a settlement offer as part of the requirement that the parties engage in good faith settlement efforts).

### B. The Facts Show Perdue Acted in Good Faith.

Plaintiffs fare no better on the facts, which show that Perdue and its counsel expended significant time, effort, and fee preparing for mediation and communicated with opposing counsel transparently throughout the preparatory period.[6]

From the beginning, Perdue meaningfully engaged in pre-mediation discussions and the vetting process. *See* Ex. 1 (Baldridge Decl.) ¶10; Ex. 2 (Rinehart Decl.) ¶¶ 6-10, 13-16. Perdue's pre-mediation statement, which Plaintiffs had by April 15, stated that there could be no resolution unless Plaintiffs meaningfully engaged with certain liability issues. Ex. 2 (Rinehart Decl.) ¶ 10. Plaintiffs ignored this fact. Plaintiffs' counsel cannot now claim surprise that their failure to engage with liability rendered the mediation a pointless exercise.

In contrast to Plaintiffs' assertion that Perdue "abandoned the mediation process altogether" after it "obtained th[e] benefits" of the stay by filing impleader motions, *see* ECF 91-1 at 16, Perdue prepared for mediation until just before Perdue decided not to continue. As of the week before Perdue's mediation statement was due, Perdue's counsel had expended nearly 160 hours of time, valued at $134,000, and continued to work on Perdue's mediation statement until July 7. *Id.* ¶¶ 36-37. That is obviously not abandonment, and it eviscerates Plaintiffs' assertion that Perdue "never intended" to mediate "in good faith." *See* ECF 91-1 at 12, 15.

After Perdue both heard from Judge Connelly that Plaintiffs only wanted to focus on four categories of damages and reviewed Plaintiffs' mediation statement, it became clear that Plaintiffs had not changed their approach from the pre-mediation vetting phase. Ex. 2, (Rinehart Decl.)

[6] Plaintiffs do not substantiate their allegations with evidence. While Plaintiffs express vague confidentiality concerns, ECF 91-1 at 8 n.4, Plaintiffs' counsel could have *investigated* the permissible evidence they could have submitted, as Perdue has done, *see supra* note 2, or provided the evidence under seal, if it even exists.

¶¶ 22-26; Ex. C to Rinehart Decl. (June 24 Email from Judge Connelly). Plaintiffs' counsel still wanted to confine the entire mediation to damages. *Id.* ¶¶ 22-25. Perdue could not have known that would be the case until it received Plaintiffs' statement, and even then, Perdue took time to be sure of its position before ultimately contacting Plaintiffs' counsel on July 11. *Id.* ¶ 27. This is why "Perdue repeatedly confirmed that it intended to proceed with the mediation notwithstanding the pending motions for leave," ECF 91-1 at 14—Perdue intended to mediate all along, until Plaintiffs' counsel pushed it to decide otherwise. No matter how desperately Plaintiffs' counsel try to characterize this as a misrepresentation, it is demonstrably not.

In sum, Plaintiffs' counsel's unrelenting, myopic focus on damages and refusal to address liability is what caused Perdue to cancel the mediation, not some nefarious plan to "abuse [] the mediation process." ECF 91-1 at 3.

### C. Impleading Third Parties Does Not Constitute Misconduct and Preparing for the Case to Continue Does Not Suggest Bad Faith.

Timely seeking to add third parties does not constitute misconduct, nor is it indicative of "bad faith." Plaintiffs admit, as they must, that Perdue was "entitled to seek leave to file third-party complaints." ECF 91-1 at 14. Yet, within the same breath, Plaintiffs insinuate otherwise, labeling Perdue's third-party impleader preparations as "an undisclosed effort to expand the litigation." *Id.* Never mind that Plaintiffs' counsel are simultaneously seeking to "expand the litigation" and have represented for months their intent to file an amended complaint adding new parties and new legal theories. *See* ECF 92. Under Plaintiffs' theory, apparently, it is only bad faith to "expand the litigation" when Perdue seeks to do so. This "rules for thee, but not for me" approach should be squarely rejected.

Unable to muster any actual "prejudice" from Perdue filing motions for leave to implead third parties, Plaintiffs merely repeat the same tired arguments from their opposition to Perdue's

motions for impleader. Plaintiffs argue again that Perdue knew early on that AFFF was a potential source and Perdue's filing the impleader motion during the stay was somehow disruptive of the litigation and disruptive of the mediation. *See* ECF 91-1 at 13-14; ECF 87-1 at 12-15. Neither of these arguments has merit.

First, Perdue's motion seeking leave to file third-party complaints does not constitute "misconduct." Impleader is not only permitted under the Federal Rules but also encouraged to conserve judicial resources and avoid duplicative actions. *See* Fed. R. Civ. P. 14(a)(1) (permitting a party to file third-party claims); *Xquisite Transp., LLC v. Travelers Indem. Co.*, No. 08 cv-2905-WDQ, 2009 WL 3246960, at *2 n.4 (D. Md. Oct. 2, 2009) (explaining impleader avoids "circuity of action" and duplicative lawsuits). Accordingly, Perdue was within its rights to seek to join Johnson Controls and 3M, non-parties who "may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1); *see* ECF 91-1 at 14 (Plaintiffs conceding as much).

Second, seeking impleader during a stay of deadlines for mediation purposes is not evidence of bad faith.[7] The stay did not postpone all litigation activities. *See* ECF 62 (joint motion requesting stay "to focus on mediation" but also acknowledging third-party discovery would continue); ECF 63 (granting the joint motion). The stay paused scheduling deadlines the Court had previously set; it did not prohibit filings. *See United States v. Trump*, No. 23-cv-256-TSC, 2024 WL 194739, at *2 (D.D.C. Jan. 18, 2024) ("[S]taying the deadline for a filing is not the same thing as affirmatively prohibiting it. The basic function of a deadline is not to authorize a filing, but to time-limit it[.]"). Thus, Perdue's filing during the stay was permissible.

[7] Plaintiffs' suggestion that the timing of the third-party complaint has something to do with MDE's investigation is unintelligible. ECF 91-1 at 14. It is unclear what "leverage" they believe Perdue gains from the investigation and remediation progressing, which would have occurred regardless of this litigation. *See id.*

Further, and as a practical matter, no mediation is guaranteed to be successful. There is nothing improper about seeking impleader to protect Perdue's interests in the event mediation is unsuccessful. "Good faith" does not require Perdue to proceed with naïve optimism or sacrifice its rights.

Good faith also does not require Perdue to wait to file impleader motions because opposing counsel asked it to do so. *See* Ex. 2 (Rinehart Decl.) ¶¶ 7, 11-12. Plaintiffs' counsel asked Perdue to delay filing until after the stay, even offering to stipulate that Plaintiffs suffered no prejudice. *Id.* ¶ 12. Now, in retaliatory fashion, because Perdue did not comply with Plaintiffs' counsel's request and just give them a "bag of money" upfront and worry about contribution later, Plaintiffs cry prejudice and accuse Perdue of "abus[ing] the mediation process" and of "undermin[ing] the integrity of the judicial process." *Id.* ¶ 16 (quoting in part ECF 91-1 at 15). The hypocrisy would be farcical if it did not abuse the very process Plaintiffs' counsel pretend to protect.

In further support of their alleged victimization, Plaintiffs' counsel now complain, incorrectly, that they received only one-day notice of Perdue's intention to file impleader motions, as if they were taken by surprise, despite discussions of including Johnson Controls in the mediation months prior. *Id.* ¶ 7 (explaining that counsel discussed the prospect of Johnson Controls attending the mediation on March 12, 2026).[8] In any event, Plaintiffs' counsel are in no position to complain of short notice when they filed the present Motion without any notice to Perdue—even though doing so could have averted this motion practice entirely because Perdue

[8] Not only is Plaintiffs' counsel's grievance refuted by the facts, but it is also internally inconsistent. On the one hand, they allege Perdue knew AFFF was a source of PFAS contamination and so Perdue could have and should have sued Johnson Controls and 3M earlier. At the same time, Plaintiffs' counsel complain that Perdue filed *during* the stay, suggesting Perdue should have waited until after the stay was lifted and after mediation failed.

could have provided evidence of its preparation efforts. *See id.* ¶¶ 28, 34-38; Ex. 1 (Baldridge Decl.) ¶¶ 8-9.

Ultimately, there is no basis to find that Perdue's exercise of its right to use ordinary, anticipated, and authorized litigation mechanisms protective of its interests while continuing to prepare for the mediation constitutes "bad faith."

**II. Manufactured Harm Does Not Entitle Plaintiffs to Relief.**

Even if Plaintiffs could articulate bad faith on Perdue's part (they cannot and have not), they fail to satisfy the but-for causation standard that governs fee shifting under this Court's inherent authority. *See Keyes Law Firm*, 120 F.4th at 145. Every category of harm they invoke (mediation preparation costs, litigation delay, and informational disclosure) either reflects inevitable expenses (*e.g.*, development of their damages case), benefits they reaped from the very stay they now challenge (*e.g.*, preparing their yet-to-be filed amended complaint and pursuing third-party discovery), or obligations they would have faced through ordinary discovery. Plaintiffs' prejudice theory is not merely insufficient; it is internally contradictory, self-inflicted, and fundamentally at odds with the record.

**A. The Governing Standard Is But-For Causation, Not Generalized "Prejudice."**

As a threshold matter, "prejudice" is not a standalone element of the inherent-authority sanctions analysis that Plaintiffs invoke. *See Goodyear Tire & Rubber*, 581 U.S. at 103-04; *Keyes Law Firm,* 120 F.4th at 145; *Bioiberica*, 2021 WL 1840292, at *1. The multi-factor framework that treats "the amount of prejudice" as an independent element applies to *discovery* sanctions under Rule 37, not to sanctions under the court's inherent authority. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003) (applying four-factor test, including prejudice, to discovery misconduct sanctions). The operative inquiry for fee-shifting

sanctions under the court's inherent authority is but-for causation. *Keyes Law Firm*, 120 F.4th at 145 ("[The court] must 'establish a causal link' between the sanctioned behavior and the fees awarded.") (quoting *Goodyear Tire & Rubber*, 581 U.S. at 108). If "an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment." *Goodyear Tire & Rubber*, 581 U.S. at 108.

Plaintiffs' reliance on the wrong standard is not a mere semantic error. The applicable, but-for causation standard requires Plaintiffs to demonstrate that each specific dollar they seek to recover would not have been incurred absent Perdue's alleged misconduct. A generalized showing that Plaintiffs spent money and are unhappy about a *voluntary* mediation outcome does not come close to satisfying that burden.

**B. Perdue's Conduct Has Not Harmed Plaintiffs.**

Even under Plaintiffs' framing, their claimed prejudice is not attributable to any misconduct by Perdue but rather to Plaintiffs' counsel's own voluntary strategic choices.

As a preliminary matter, Plaintiffs' claimed attorneys' fees are facially absurd. Plaintiffs claim that their counsel "devoted more than 500 hours of attorney time and more than 900 hours of paralegal time to preparing for mediation and completing the mediation statement." ECF 91-1 at 8. Accordingly, Plaintiffs' counsel claim to have expended 1,400 hours and $400,000 in fees preparing their 22-page mediation statement. *Id.* at 2-3.

Plaintiffs provide no evidence or accounting to justify this fee claim. *See generally* ECF 91-1. Instead, they offer to "provide declarations, expert and consultant invoices, and other documentation substantiating these fees, costs, expenses, and time expenditures to the Court upon request." ECF 91-1 at 16 n.6. That will not suffice. It is Plaintiffs' burden as the movant to justify its fee request; it is not the Court's job to ask Plaintiffs for their proof. *See Guillen v. Armour Home Improvement, Inc.*, No. 19-cv-2317-DLB, 2024 WL 1346838, at *21 (D. Md. Mar. 29, 2024)

("The burden of identifying which hours are recoverable rests on the party moving for fees, not the district court." (citing *Fair Hous. Council of Greater Wa. v. Landow*, 999 F.2d 92, 98 (4th Cir. 1993))).

In any event, the claim that it took 1,400 hours and $400,000 to prepare the 22-page mediation statement strains credulity. Plaintiffs' counsel are likely including all time generally spent on expert development merely because such testimony was relied upon in the mediation statement (though, of course, it is impossible to know for sure considering the utter lack of evidence), but there is no legal basis for Perdue paying for Plaintiffs to generally develop their damages theory, work that Plaintiffs always would have needed to do to prove their case.

In the unlikely event that Plaintiffs did, in fact, spend 1,400 hours drafting a 22-page mediation statement and coordinating with experts, such a figure would "shock the conscience," and can be rejected outright. *Landow*, 999 F.2d at 94. Any timesheet showing 1,400 hours expended on a 22-page document would be "so grossly in excess of any realistic amount as to be unworthy of consideration, even as a starting point." *Id.* at 95. In such circumstances, the "district court may deny an outrageous fee request without any detailed analysis whatsoever." *Guillen*, 2024 WL 1346838, at *20 (citing *Landow*, 999 F.2d at 96). Fees cited as evidence of harm cannot be an "opening bid in the quest for an award," *see Guillen*, 2024 WL 1346838, at *21 (quoting *Landow*, 999 F.2d at 97.

Even assuming the claimed numbers are accurate and supported, they are not attributable to Perdue. Plaintiffs' counsel chose to spend resources on mediation preparation. Perdue did not compel those expenditures, dictate their scope, or require Plaintiffs to retain experts in six different specialty fields. *See* ECF 91-1 at 8 (noting Plaintiffs' work "with experts in the fields of hydrogeology, internal medicine, toxicology, air modeling, medical monitoring programs, and

economics"). Nothing about Perdue's conduct forced Plaintiffs to incur expenses of a particular magnitude; those decisions were Plaintiffs' counsel's own.

Indeed, Perdue specifically offered to follow Judge Connelly's mediation protocol, which required a simultaneous exchange of mediation statements addressing specific, limited issues, to minimize time and fees for both sides. *See* Ex. 2 (Rinehart Decl.) ¶¶ 17-19, Ex. A to Rinehart Decl. (Judge Connelly's Pre-Mediation Letter). Plaintiffs' counsel preferred a procedure consisting of initial statements and replies. *Id.* ¶¶ 18-19. Indeed, Plaintiffs' counsel indicated an intent to respond to Perdue's mediation statement, *i.e.*, *Plaintiffs' counsel* wanted to undertake additional work not required by the mediator or demanded by Perdue. *See* Ex. B to Rinehart Decl. at 3 (Email from B. Ceryes) ("We are fine with Perdue's statement following ours, but we would prefer to have something from Perdue before the week before mediation so we could have some time to respond."). When the Parties subsequently discussed what effect the third-party complaints would have on mediation, Perdue's counsel expressed understanding if Plaintiffs decided they did not want to proceed to mediation at this time. Ex. 2 (Rinehart Decl.) ¶¶ 13-15. But Plaintiffs chose to continue with mediation. *Id.* Thus, Plaintiffs' time and money spent was a product of their own strategic choices, not Perdue's conduct.

Plaintiffs' concessions confirm this fact, as they acknowledge that "some portion of the work performed in preparation for mediation may ultimately prove useful in this litigation even though Perdue cancelled the mediation," ECF 91-1 at 16, but they offer nothing to establish which expenses those are. The but-for test does not permit a movant to claim an arbitrary fraction of expenses that would have been incurred regardless of the alleged misconduct and thereby manufacture a causal link where none exists. *See Goodyear Tire & Rubber*, 581 U.S. at 109

("[t]his but-for causation standard generally demands that a district court *assess and allocate specific* litigation expenses").

The reality is that every dollar spent on expert reports in hydrogeology, internal medicine, toxicology, air modeling, medical monitoring, and economics is a dollar that any competent litigant may need to spend to prosecute a PFAS contamination class action. These are not costs attributable to the mediation process; they are core litigation expenses that Plaintiffs would have incurred regardless of whether the mediation occurred given the case Plaintiffs themselves chose to bring. *See id.* at 109 ("[W]hen the cost would have been incurred in the absence of [the sanctionable conduct], then the court (possessing only the power to compensate for harm the misconduct has caused) must leave it alone.") (cleaned up); *see Adams v. Whitestone Grp., Inc.*, No. 21-cv-03120, 2023 WL 2712587, at *6 (D. Md. Mar. 30, 2023) (excluding from sanctions award fees for reviewing discovery "that would have been needed regardless of when the messages would have been produced").

The same is true of Plaintiffs' claim that they were prejudiced by disclosing "substantial information for settlement purposes" without receiving a reciprocal mediation statement from Perdue. ECF 91-1 at 16. The information Plaintiffs disclosed—*i.e.*, their damages theories, expert analyses, and claims regarding personal injuries—is information they would need to disclose in discovery and at trial. Indeed, as Plaintiffs admit, they disclosed essentially the same information in their pre-mediation statement, before the Parties even determined that mediation could be viable. ECF 91-1 at 2. Plaintiffs have identified no concrete harm from having shared information they would have been obligated to disclose through the normal course of litigation.

Plaintiffs' theory of prejudice contains an irreconcilable internal contradiction. On one hand, Plaintiffs argue that Perdue cancelled the mediation because Plaintiffs' mediation statement

was not "materially different" from their pre-mediation vetting statement. *Id.* On the other hand, Plaintiffs seek $100,000 in expert and legal fees on the theory that their mediation preparation involved substantial new analysis and expert work worthy of reimbursement. *Id.* at 8-9, 15-16. Plaintiffs cannot have it both ways. If their mediation statement contained no materially new information, then the work underlying it was largely duplicative of work already performed for the vetting phase and for litigation generally. If, on the other hand, the mediation statement reflected genuine, new analysis (provided in the context of Perdue's warning regarding Plaintiffs' counsel's focus on damages to the exclusion of all other issues), then Perdue's assessment that the statement illustrated that mediation would not be productive was a reasonable conclusion.

The record of Perdue's own significant expenditures on mediation preparation is also inconsistent with the prejudicial narrative Plaintiffs construct. *See supra* Section I.B. Perdue participated in the pre-mediation vetting process, submitted its own vetting statement to Judge Connelly, engaged in meet-and-confer discussions, and devoted considerable attorney time and expense to preparing for the scheduled mediation session. *See, generally*, Ex. 1 (Baldridge Decl.); Ex. 2 (Rinehart Decl.). Perdue's decision not to proceed with a mediation that it ultimately concluded would be unproductive is a legitimate exercise of litigation judgment, as well as a reasonable decision to *prevent* any further delay or prejudice to any party.

### C. Plaintiffs Benefitted From the Stay.

Far from causing harm, the stay provided Plaintiffs with time and freedom to build their affirmative case, and then some. The stay allowed them to develop their damages theories, engage in months of intensive collaboration with experts in six separate fields, and spend, allegedly, 1,400 hours preparing a "comprehensive 22-page mediation statement" supported by "nearly 800[9]

[9] Plaintiffs' "nearly 800 pages" of expert reports cannot be fairly characterized as pure expert analysis or completely new material. Among the expert materials are (1) a 130-page report,

pages of attached reports from multiple experts," all work that Plaintiffs' counsel concede "may ultimately prove useful in this litigation." ECF 91-1 at 2, 8-9, 16; *see also* Ex. 2 (Rinehart Decl.) ¶ 26 (expressing that Plaintiffs' mediation statement contains content that is not specific to mediation). To suggest that Plaintiffs' mediation statement content would not otherwise be useful in the litigation would be to minimize the utility of the very expert analyses they put before Perdue and the mediator as establishing their damages, including, but not limited to, an analysis of possible pathways for PFAS contamination, a discussion of remedial measures to address PFAS contamination, and an evaluation of the needs for a medical monitoring plan. Ex. 2 (Rinehart Decl.) ¶ 25.

Moreover, Plaintiffs used the stay to engage in wide-ranging third-party discovery, allowing them more opportunity to investigate factual issues and further strengthen their case. During the stay, Plaintiffs provided Perdue with 11 notices of intent to serve subpoenas on third parties. *Id.* ¶ 33. In the same period, Perdue also produced to Plaintiffs more than 115,200 pages of responsive documents on behalf of third parties (some responsive to Plaintiffs' third-party subpoenas and others to Perdue's subpoenas). *Id.* ¶ 32.

Between third-party discovery, the extensive development of damages theories, and the thorough expert work, Plaintiffs cannot now claim that the stay consisted of anything other than time well spent developing their case. The sanctions framework does not permit a movant to claim prejudice from a period of delay during which the movant reaped tangible benefits. *See Goodyear*

---

111 pages of which are an attachment Plaintiffs filed with this Court more than a year ago, on Aug. 1, 2025, *see* ECF 42-2, (2) one 407-page expert report composed of 12 pages of actual report material and 395 pages of the expert's resume and filings in cases in which the expert has been involved, and (3) 48 pages of one expert's resume and qualifications. *See* Ex. 2 (Rinehart Decl.) ¶ 25.

*Tire & Rubber*, 581 U.S. at 108 (sanctions must be "calibrate[d] to [the] damages caused by" the bad-faith acts).

Plaintiffs' prejudice theory is further undermined by the fact that the stay shielded them from their own outstanding discovery obligations. Plaintiffs claim to have lost "months of discovery progress" because of the stay, ECF 91-1 at 17, but conveniently omit that they have been withholding discovery for *nine months*—since November 2025—relying on their stated intent to amend their complaint (an amendment that, as of this filing, Plaintiffs have still not made). *See* ECF No. 89-3 (March 3, 2026 Letter from J. Douglas Baldridge to Philip Federico). The stay suspended Plaintiffs' obligations to respond to outstanding discovery and to meet the Scheduling Order's May 1, 2026 deadline for moving to join additional parties or amend pleadings. But for the stay, that deadline would have long since passed. It is absurd for Plaintiffs to complain that *Perdue* "set this case back a year or more," when Plaintiffs have not even decided *who* the named plaintiffs are that are actually suing Perdue. ECF 91-1 at 17.

## III. Sanctions Would Be Warranted in Response to Plaintiffs' Counsel's Unjustified Sanctions Motion Pursuant to Local Rule 105.8(a).

Recognizing the potential for misuse, Local Rule 105.8(a) provides that "sanctions will not be filed as a matter of course." In the event a party defies this mandate, the Local Rules warn that the Court "will consider in appropriate cases imposing sanctions." *Id.*; *Fitch v. St. Paul's Sch. for Girls*, No. 24-cv-00938-SAG, 2025 WL 1346605, at *4 (D. Md. May 8, 2025) (cautioning that the filing of frivolous sanctions motions is "itself sanctionable conduct" and citing Local Rule 105.8(a)).

In this case, sanctions would be warranted to compensate Perdue for the fees spent defending against Plaintiffs' frivolous Motion, which is unsupported by law or facts, and relies only on conjecture. *See supra* Section I; *see also Blue v. U.S. Dep't of Army*, 914 F.2d 525, 539

(4th Cir. 1990) (upholding sanctions when "the only 'evidence' ever advanced by plaintiffs on their claims were their own 'unsubstantiated, self-serving, contradictory, and inconsistent claims'" (citation omitted)). Plaintiffs' counsels' failure to exercise reasonable due diligence to investigate their claims is inexcusable, as is their fee request, which appears designed to enrich Plaintiffs' counsel for the work Plaintiffs would have needed to do regardless of mediation.[10]

Although sanctions would be warranted, Perdue believes the Parties' and the Court's efforts would be better spent focusing on keeping the case moving forward, and therefore, at this time, Perdue is not asking for sanctions pursuant to Local Rule 105.8(a). Should Plaintiffs' counsel continue this type of meritless and vexatious litigation conduct, Perdue may be forced to reconsider its position.

## CONCLUSION

This regrettable, avoidable Motion distracts attention from the substance of the litigation, has necessitated disclosures of conversations that should have remained private, and ultimately, lacks any basis in law or fact. Perdue respectfully requests that the Court deny Plaintiffs' Motion to Terminate the Stay of Deadlines and for Sanctions. A Proposed Order to this effect is attached.

Dated: August 11, 2026

Respectfully submitted,

/s/

Venable LLP
J. Douglas Baldridge (Federal Bar No. 11023)
Jeffrey S. Nestler (Admitted *pro hac vice*)
600 Massachusetts Avenue, N.W.
Washington, DC 20001

[10] Although Plaintiffs' counsel apparently failed to spend the time to investigate the veracity of their accusations, Plaintiffs did spend the time to prepare a statement to the press the day after filing their motion and to update their website. *See supra* page 8. That Plaintiffs' counsel filed a meritless motion that they then used as a cudgel in the press further supports a finding that Plaintiffs' counsel misused the judicial process.

(202) 344-4703 (phone)
(202) 344-8300 (fax)
jbaldridge@venable.com
jnestler@venable.com

Elizabeth C. Rinehart (Federal Bar No. 19638)
Catherine G. Ottenritter (Federal Bar No. 20941)
Robyn S. Lessans (Federal Bar No. 31158)
Cogan R.S. Rooney (Federal Bar No. 31476)
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7400 (phone)
(410) 244-7742 (fax)
lcrinehart@venable.com
cgottenritter@venable.com
rslessans@venable.com
crrooney@venable.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 11, 2026, I electronically filed Defendants' Memorandum in Opposition to Plaintiffs' Motion to Terminate the Stay of Deadlines and for Sanctions.

I FURTHER CERTIFY that, pursuant to this Court's Standing Order 2025-05, Exhibits A, B, C, and D to Exhibit 2 (Declaration of Elizabeth C. Rinehart) were also served on opposing counsel via email.

I FURTHER CERTIFY that a courtesy copy of the foregoing Memorandum will be sent by overnight mail to the Clerk's Office.

/s/
Elizabeth C. Rinehart